**240 P.2d 536**

**CARNES v. INDUSTRIAL COMMIS-
SION et al.**

**No. 5540.**

Supreme Court of Arizona.

Feb. 11, 1952.

Rehearing Denied March 4, 1952.

Laney & Laney, of Phoenix, for petitioner.

H. S. McCluskey, of Phoenix (Robert E. Yount and Robert W. Pickrell, Phoenix, of counsel), for respondent Industrial Commission of Arizona.

Darrell R. Parker, of Phoenix, for respondent Agro Phosphate Co., a California corporation.

STANFORD, Justice.

On April 28, 1950, Elton Ernest Carnes, Jr. sustained fatal injuries from an accident arising out of and in the course of his employment. He left surviving him his widow, Edna Florence Carnes, petitioner, and three minor children. The accident was caused by an explosion which occurred while Carnes was welding a liquid fertilizer tank owned by the Arizona Agro Phosphate Company, an Arizona corporation, on its premises in Phoenix.

Petitioner duly filed her application for compensation with the Industrial Commission of Arizona. In due course a hearing was held and, on April 28, 1951, the commission entered its finding and award; denying compensation to the petitioner on the ground that decedent, at the time of his injury, was the employee of the Agro Phosphate Company, a California corporation. Upon rehearing, the commission handed down its decision affirming its prior award denying compensation.

For about three years prior to the date of the accident Carnes had been steadily employed in California by a California corporation known as the Agro Phosphate Company, working on liquid fertilizer tanks owned by it. The business of the California corporation; as well as that of the Arizona corporation, was the sale and

distribution of liquid fertilizer. The officers and controlling stockholders of both corporations were members of the Greening family, of California.

A few days before the date of the accident, Raymond Laine, the manager of the Arizona corporation, telephoned Gordon Greening, who was president of the California corporation, and also secretary-treasurer of the Arizona corporation, and asked Greening to loan Carnes to him to do some welding on tanks of the Arizona corporation which were in need of repair. During the previous two years it had been the custom of the Arizona corporation on occasion to borrow skilled employees from the California corporation. On all these occasions the employees would remain on the payroll of the California corporation, although the wages for the time they worked for the Arizona corporation and a proportionate share of withholding and social security taxes, together with a small amount for bookkeeping, would be charged to the Arizona corporation on an open account and later paid by the Arizona corporation. Carnes agreed to go to Arizona and do the work for the Arizona corporation, whereupon Greening, acting as secretary-treasurer of the Arizona corporation, drew a check for fifty dollars on the Arizona corporation in favor of Carnes, as expense money for his trip. Two years previous to this, Carnes, under the same arrangement, had worked for the Arizona corporation in Phoenix, building storage tanks under Laine's direction.

On April 27, 1950 Carnes arrived at the plant of the local company in Phoenix. He asked to see Laine, the manager, but the latter was out. When Laine returned to the plant he outlined the work he wanted done. He showed Carnes the tanks he wanted welded and where the leaks were in those tanks. Laine furnished Carnes a welding machine with which to work and had some of his men assist Carnes in preparing the tanks that were to be welded. Laine stayed after normal quitting time that evening and directed Carnes in his work until about 7 o'clock when they both quit for the day. The explosion which was fatal to Carnes took place the following evening. The tank on which Carnes was welding at the time of the explosion had developed a leak after Carnes had arrived on the job and Laine had asked Carnes to repair the same.

This appeal is from the award of the industrial commission denying petitioner's claim for compensation under the Arizona workmen's compensation law.

The industrial commission's award is based upon its contention that Carnes was an employee of the California corporation at the time the fatal accident occurred. Petitioner contends Carnes was a "loaned employee", under the supervision of the Arizona corporation, and comes within the provision of the Arizona workmen's com-

pensation law. The general issues involved in this case are well stated in 58 Am.Jur. 812, § 343, which reads in part as follows: " * * * In the absence of any controlling statutory, or any express or implied contractual, provision to the contrary, the rule. may be stated to be that a general employer, that is, the employer contracting directly with the employee, is liable for workmen's compensation in the event of an injury to the employee unless it is shown by the terms of a loan hiring or similar arrangement that the general employer relinquished for the time being all primary benefits to and substantial right to control the work; and if, on the other hand, it is shown by any such arrangement that the general employer relinquishes the services and control of an employee so that the employee becomes for the time being subject to the supervision with another, the latter becomes liable for compensation for an injury sustained in the course of such work, and the general employer is absolved from liability therefor. As stated in several cases, the employee must look for compensation to the employer under whose direction and control he was working at the time of the injury. * * *"

First let us define the word employee by referring to the Arizona workmen's compensation law. Section 56–928, A.C.A. 1939, states in part:

" * * * For the purposes of this section 'regularly employed' includes all employments, whether continuous throughout the year, or for only a portion of the year, in the usual trade, business, profession, or occupation of an employer.

"(b) When an employer procures work to be done for him by a contractor over whose work he retains supervision or control, and such work is a part or process in the trade or business of the employer, then such contractors and the persons employed by him, and his subcontractor, and persons employed by the subcontractor, are within the meaning of this section, employees of the original· employer. * *"

Section 56–929(a) 2 of our code states as follows: "(a) In this article, unless the context otherwise requires, the terms 'employee,' 'workman,' and 'operative' mean: * * * 2. every person in the service of any employer subject to the provisions of this article, including aliens and minors legally or illegally permitted to work for hire, but not including a person whose employment is casual and is not in the usual course of trade, business or occupation of the employer."

We have often been called upon to construe the effect and meaning of the above cited sections of our code. We will now apply the facts of the case at bar to the law in this jurisdiction.

■ The first question to consider is whether Carnes work was in the usual course of trade, business or occupation of the employer. In S. H. Kress & Co.

v. Industrial Comm., 38 Ariz. 330, 299 P. 1034, we held that the making of repairs to a building were in the usual course of trade, business or occupation of the employer and allowed compensation as an employee to a carpenter engaged solely to make such repairs as then were needed. Raymond Laine, the manager of the Arizona corporation, testified that he had on several occasions employed local welders to perform the same type of work in which Carnes was engaged at the time of the accident but that he was not satisfied with their work. It follows therefore that Carnes' work in repairing the tanks of the Arizona Agro Phosphate Company was in the usual course of trade, business or occupation of the employer.

The next matter to consider is the question of supervision and control. In Grabe v. Industrial Comm., 38 Ariz. 322, 299 P. 1031, 1034, we emphasized the importance of this question: " * * * if A procures B to do certain work for him which is a part or process in A's trade or business, and retains supervision or control over the work, then B and all B's employees and subcontractors to the Nth degree are, for the purposes of the Compensation Act, employees of A, no matter what the terms or method of employment or compensation. It is obvious that were this not so the beneficient purposes of the act could and would be easily defeated or evaded by unscrupulous employers through the aid of various dummy intermediaries.

The statute therefore brushes aside all forms and subterfuges and provides that one just, simple, and definite test. If the work be part of the regular business of the alleged employer, does he retain supervision or control thereof? All other matters are of importance only as they throw light on this question."

Respondent contends that Carnes was not under the supervision and control of the Arizona corporation but was the employee of the California corporation and subject to its exclusive control and supervision. Respondent further contends that Carnes was a highly skilled workman and did not require supervision in his work by Mr. Laine, and point out that there was no evidence that the manager of the Arizona corporation, Mr. Laine, had any knowledge of the welding business, or how the work should be performed, or that he was competent to, or did, direct the highly skilled work of Mr. Carnes. In Industrial Commission v. Navajo County, 64 Ariz. 172, 167 P.2d 113, 118, the court said: " 'Supervision or control' as used in Section 56–928 of the Compensation Law does not mean that the board of supervisors or the employer may direct the thinking, or direct the technical manner of performing the work or services of a doctor, lawyer, engineer, etc. This, however, does not change his 'status' under the Workmen's Compensation Law. The employer, having the right to direct the time and the place in which the services are to be rendered,

the persons to or for whom the services are to be rendered, and the degree and amount of said services, exercises supervision and control over the person performing them as it is duly bound to do."

In Industrial Commission v. Meddock, 65 Ariz. 324, 180 P.2d 580, 584, we said: "It is the right to control rather than the fact that the employer does control that determines the status of the parties, and this right to control is, in turn, tested by those standards applicable to the facts at hand."

If respondent's claims were true, then we ask, could any highly skilled workman become a special employee, unless by chance his special employer had a sufficient technical knowledge and skill to direct the employee in the details of his work? We believe the correct rule is as stated in Jones v. George F. Getty Oil Company, a New Mexico case, 10 Cir., 92 F.2d 255 at page 259: "The controlling factor is: For whom is the work being performed, and who had the power to control the work and the employee? The authority to determine the work to be done, and the manner in which it is to be carried on, necessarily includes the right to suspend or terminate the work altogether or, possibly, to exclude the particular employee from the job, not including the right to discharge the employee from the service of his general employer, * * * nor need it include the actual giving of directions to the employee in connection with the work he is doing."

Mr. Laine testified that he had the power to terminate Carnes' employment in the event that his work was not satisfactory.

(Mr. Parker) "If we might assume something for the purpose of a hypothetical question which perhaps I will be permitted to ask, it is a little far fetched, but assume that Mr. Carnes' work had not been as you had directed, would you have hesitated to terminate his services here?"

(Mr. Laine) "His services here would have been terminated right then."

Respondent raises the argument that the supervision of the California corporation over the Arizona corporation was of such a degree as to make the Arizona corporation the alter ego of the California corporation. The fallacy of that reasoning is pointed out by assuming that Mr. Laine, the manager of the Arizona corporation, had been the injured party. Could respondent then contend that Laine was under the supervision and control of the California corporation to such an extent as to not be entitled to the benefits of the Arizona workmen's compensation law? We think not. It is true, as respondent points out, that Carnes name was never on the payroll of the Arizona corporation, nor was he paid directly by the Arizona corporation. He looked to the California corporation for his salary at all times. The evidence shows, however, that the Arizona corporation was charged for the use of Carnes. The California corporation was not out of pocket by virtue of

the fact that Carnes remained on its payroll while performing services for the Arizona corporation. In each instance the California corporation would charge the Arizona corporation an amount commensurate with the salary Carnes would have received had he been working for them, plus a small bookkeeping fee, etc. We believe the California corporation did not exercise the primary right of control and supervision over Carnes while he was engaged in performing services for the Arizona corporation, nor did it receive the primary benefits of his work here. A leading case stating the general rule is that of Parsons v. M. J. Daly & Sons, 114 Conn. 143, 158 A. 216, 218, in which the court said: "The principle is thoroughly well established at common law that an employee of one master who is loaned to another master, and who assents to the change of masters, becomes the servant, for the time being, of him to whom he is lent, and this principle has full application to the master and servant relation under the Compensation Act."

The following cases support the general rule. Sgattone v. Mulholland & Gotwals, 290 Pa. 341, 138 A. 855, 58 A.L.R. 1463; Tarr v. Hecla Coal & Coke Co., 265 Pa. 519, 109 A. 224; In re Scribner's Case, 231 Mass. 132, 120 N.E. 350, 3 A.L.R. 1178; Berrier v. Associated Indemnity Co., 142 Fla. 351, 196 So. 188.

 Respondent further relies on the fact that the Arizona corporation did not pay any premiums on Carnes or report him as being an employee. It contends there was a lack of "good faith" which prevents the rule, as laid down in the West Chandler Farms case from applying to the case at bar. We quote from West Chandler Farms Co. v. Industrial Commission, 64 Ariz. 383, 173 P.2d 84, 90: "It must be borne in mind that this is a proceeding instituted on behalf of the applicant Webb for compensation. The evidence discloses that the applicant was in the employ of an employer who was insured by the commission as insurance carrier under a general coverage policy, that is to say, a policy that covered all employees of the petitioner who were entitled to compensation under the law. It seems to be the settled law that stipulations and warranties in workmen's insurance policies by the employer do not affect the right of the employees and their beneficiaries to recover under such policies compensation provided by law. They affect only rights of the employer and insurer inter sese. The insurer may have the right to recover over against the employer any damages sustained by a breach of the policy, but this in no way affects the rights of the employee. His rights 'cannot be narrowed by contract between the employer and insurer.'" (citing cases)

We cannot say there was a lack of good faith in this case. The Arizona corporation filled out an accident report on Carnes on the form appropriate for an employee of its company. This report was

not filed because a representative of the industrial commission said it was not necessary, because in his opinion, Carnes was an employee of the California corporation.

We are aware of the hardship this type of case creates on the industrial commission fund. No insurance fund can remain solvent if the insurer does not collect premiums, nor can it remain solvent if premiums are collected only on those cases in which losses occur. We suggest to the Legislature that it should amend the law so that employers who do not pay premiums on their employees will bear the cost of compensation benefits arising from injured workmen on whose wages no premiums were paid.

Award set aside.

UDALL, C. J., and PHELPS, DE CONCINI and LA PRADE, JJ., concur.