### ROBINSON v. SOUTHLAND FROZEN FOODS, Inc., et al.

Industrial Commission.

June 30, 1953.

James M. Moody of Trinkle & Moody, Plant City, for claimant.

J. H. Hansbrough of Macfarlane, Ferguson, Allison & Kelly, Tampa, for employer and insurance carrier.

E. O. HENRY PALERMO, Deputy Commissioner.

At approximately 7:30 P.M. on September 12, 1952, while at the place of his employment at Southland Frozen Foods, Inc. in Plant City, having been struck by a fist in the right eye by a fellow employee, claimant received an injury to his right eye resulting in a detachment of the retina in its upper outer quadrant. Replacement operation of the detached portion of the right retina was performed on October 8, 1952. Subsequent medical examinations revealed that the retina was in place and in all probability his vision would be good. He was discharged from the hospital on October 27, 1952, and was given peep-hole glasses to wear. His convalescence was uneventful and on December 6, 1952 the vision in his right eye was 20/40. On December 13, 1952, claimant was again examined by Dr. Hugh E. Parsons of Tampa, receiving a history that claimant had had light flashes in the right eye for the past five days. He also stated that five days previously he had been driven to Fort Myers and back. On December 20, 1952, the retina was found to be detached in the lower outer quadrant of the right

eye. Replacement operation was performed on January 8, 1953, and his post-operative convalescence was uneventful except for the fact that the retina never fell into its normal position. At the time of the hearing, vision in the right eye was light perception only, and in the opinion of Dr. Parsons, this eye had lost all useful vision and further surgery was contra-indicated.

The testimony of claimant and the witnesses to the event shows that on Saturday afternoon, September 12, 1952, claimant was at the Southland plant as foreman of the clean-up crew supervising the cleaning of machinery and equipment. During that afternoon, he had occasion to reprimand one Giddens, a Southland employee, regarding the performance of his work. At about 7:30 P.M. claimant was standing on a loading platform on the Southland premises when Giddens informed him that he was quitting his job, and claimant replied "That suits me fine,", or words to that effect, whereupon Giddens challenged claimant to take off his glasses and step off the platform and settle their differences. Claimant removed his glasses, handed them to Womble, another employee, and stepped off the platform. Giddens then said, "I just wanted to see if you had guts enough to take off your glasses; let's call it off." Claimant returned to the platform and Giddens followed him. As claimant reached for his glasses from the hand of Womble, and while partially turned away from Giddens and not looking, Giddens struck him in the right eye, resulting in the original injury to the eye.

Southland filed an "Employer's First Report" which was introduced in evidence, and the Insurance Co. of North America accepted the claim and paid compensation for one week. Thereafter the claim was controverted on the following grounds—"the condition complained of did not arise or result from an injury arising out of and in the course of the claimant's regular employment with Southland Frozen Foods, Inc.;" and—"the employer and carrier reserve the right to controvert any claim on any other and further grounds which may be or become available;" and further that—"the condition complained of did not arise or result from an injury by accident arising out of and in the course of claimant's regular employment with Southland Frozen Foods, Inc.; that the claimant received his injury under circumstances which do not entitle him to the benefits of the Florida workmen's compensation act, and that there is no causal connection between claimant's present disability and his injury."

Douglas-Guardian Warehouse Corp. through its carrier, Employers Mutual Liability Ins. Co. of Wisconsin, controverted the claim from the beginning on the ground—"that the claimant's con-

dition is not the result of an accident arising out of and in the course of his employment with the Douglas-Guardian Warehouse Corp."

From the time of the first injury claimant was paid his regular salary every two weeks, averaging $60 per week, until December 31, 1952 at which time his employment was terminated.

Prior to and after the time of the accident until his employment was terminated, claimant was paid his salary by check drawn by Douglas-Guardian Warehouse Corp., which in turn billed Southland Frozen Foods, Inc., for this salary together with other items such as social security, workmen's compensation insurance covering claimant's services as a warehouse employee, and was reimbursed by Southland Frozen Foods, Inc. for these charges.

The issues raised in these claims may be stated as follows—1. By whom was claimant employed at the time of the accident? 2. Did claimant suffer an injury as a result of an accident arising out of and in the course of his employment? 3. Was the original injury to the eye the primary or proximate cause of the second detachment and is there a causal connection between the two?

In order to arrive at a conclusion as to who was claimant's employer at the time of the accident it is necessary to go into the modus operandi of the two corporations and the circumstances under which he was employed. Southland Frozen Foods, Inc. operates a plant in Plant City with machinery and equipment for processing and packing various food items. Douglas-Guardian Warehouse Corp. operates field warehouses for the benefit of various manufacturers and processers. In the instant case the containers used by Southland were stored in a warehouse operated by Douglas-Guardian so that Southland could obtain them at the time they were needed by it for the processing and packing of various food items. The Southland plant and the Douglas-Guardian warehouse were some six or seven blocks apart in Plant City.

Claimant started to work for Southland approximately five years ago and was in charge of a crew of men who cleaned up the various food machinery after it had been used in packing food items. After working for Southland for some three years claimant upon recommendation of his employer, was appointed by Douglas-Guardian as its bonded representative. A copy of "Articles of Agreement with Bonded Representative" was introduced in evidence and in effect provides that claimant was appointed as its bonded representative for its warehouse in Plant City at an hourly wage, plus time and a half for overtime beyond forty hours a week. Also introduced in evidence was a "Warehousing Contract" between Douglas-Guardian

and Southland which in effect provides that Douglas-Guardian will provide and maintain a public warehouse for the convenience of Southland in its operation, pay the wages and other items due for warehouse services, etc., and that these sums shall be reimbursed to Douglas-Guardian by Southland.

Claimant's duties as bonded representative of Douglas-Guardian were to be in charge of the warehouse, to place goods therein and to deliver goods therefrom upon receipt of payment from Southland and authorization from Douglas-Guardian. He also kept an inventory. These duties were performed at the Douglas-Guardian warehouse and consumed approximately two hours per day or ten to twelve hours per week. The remainder of claimant's time, averaging more than forty hours per week, was spent working for Southland. He continued to perform the same duties for Southland which were performed by him prior to his designation as bonded representative for Douglas-Guardian.

It is apparent that claimant was an employee of Douglas-Guardian when he was doing warehouse work and an employee of Southland when he was doing food plant work. Such a situation is not unusual and the employer under whose control and for whose benefit work was being done at the time an injury occurs is the employer responsible under the Act. In this case Southland, through Douglas-Guardian, was paying claimant's full salary, including his services as a warehouseman, as that was an item of cost under the warehousing agreement, and his services as its employee, because it received the benefit of his services. The agreement between claimant and Douglas-Guardian for warehouse services was written and formal, whereas the agreement between claimant and Southland for food plant services was oral and informal. Each, however, was a contract of employment and clearly recognized as such under section 440.02 of the Act dealing with contracts "express or implied, oral or written."

It makes no difference, from a legal theory viewpoint, whether this case be regarded as one of a loaned employee or as one of a dual employment. In the first instance Douglas-Guardian as general employer would be considered as having loaned claimant to Southland, as special employer, and Southland would be claimant's employer while doing Southland work. In the second instance, Douglas-Guardian would be the employer with respect to the warehouse work and Southland would be the employer with respect to the food plant work. Thus, the result would be exactly the same.

This conclusion is supported and clearly established in the case of Berrier v. Associated Indemnity Co. (Fla.), 196 So. 188, wherein a regular employee of a Florida corporation was, at the time of his

accidental death, working for a Virginia corporation for the purpose of assisting in the installation of new equipment in the plant of the Virginia corporation. The widow's employee proceeded under the Florida workmen's compensation law—claiming that at the time of her husband's death he was an employee of the Florida corporation. It was held that the employee was an employee of the Virginia corporation at the time of his death and the claim was denied. The Florida Supreme Court quoted with approval from the decision of the Wisconsin Supreme Court in Seaman Body Corp. v. Industrial Commission, 235 N. W. 433.

A case similar to the case at bar was decided by the Wisconsin Supreme Court in Western Weighing & Inspection Bureau v. Industrial Commission, 250 N. W. 834, in accordance with settled principles that the employer for whom the work was being performed at the time of injury should be held responsible. In that case one Cronin was employed by Western Weighing & Inspection Bureau, but it was understood that when he was not weighing he was to perform services for the railroad. His wages were paid by the Bureau twice a month and charged to the railroad. At the time the applicant was injured, he was engaged in the performance of railroad work—and the court held that at the time of his injury he was in the employ of the railroad. See also Murphy Supply Co. v. Frederickson (Wis.), 239 N. W. 420; Carnes v. Industrial Commission (Ariz.), 240 Pac. 2d 536; and Combustion Engineering Co. v. Industrial Commission (Wis.), 35 N. W. 2d 317.

It is conclusive from the evidence and the law that at the time of his injury claimant was at the Southland plant performing services for Southland which was receiving the benefit of his services, and was an employee of Southland and not an employee of Douglas-Guardian, and therefore the claim against Douglas-Guardian Warehouse Corp. should be dismissed.

Turning next to the question whether the claimant received an injury under circumstances which would entitle him to the benefits of the Act, the leading case in this state regarding the compensability of injuries arising from assault by one worker upon another is Florida Forest & Park Service v. Strickland (Fla.), 18 So. 2d 251, which involved a shooting injury to an employee who had become engaged in a gun battle with another as a result of a dispute arising out of their work, and where it was held that there was sufficient evidence to justify a holding that the injury was compensable. See also Sherby v. Royal Hawaiian, Inc., 2 Fla. Supp. 136. From the evidence and the law I find that claimant in the instant case suffered an injury as a result of an accident arising out of and in the course of his employment.

As to the question whether the original injury to the eye was the primary or proximate cause of the second detachment of the retina, it is rather obvious from the evidence that the second detachment would not have occurred had it not been for the impaired condition of the eye resulting from the original injury. In my opinion the original injury was the primary or proximate cause of the second detachment, a causal connection between the two occurrences was conclusively established.

The principle of law here involved is well stated in Brewer v. Pan American Airways, Inc. (Fla.), 24 So. 2d 521, where the claimant was injured while employed by Pan American on May 22, 1943 and in November 1943 while working for the same employer was re-injured causing a recurrence of the injury to his back for which he was paid compensation. Later he went to work for the Miami Air Depot and in July 1944 sustained a further recurrence of the back injury while working for the latter employer. The deputy commissioner awarded compensation as against the first employer, Pan American, on the theory that the last injury was a recurrence of the original injury of May 22, 1943. The Supreme Court in affirming the order went further and stated that it was more than just a recurrence of the injury—it was a manifestation of the continuance of that injury. Applying that case to the case at bar it is obvious that the second injury received while the claimant was recuperating from the original blow to the eye was merely a manifestation of the continuance of that injury.

The principle is again stated in Eli Witt Cigar & Tobacco Co. v. Matatics (Fla.), 55 So. 2d 549, where a party has been injured in an automobile accident caused by the negligence of another and later claimed he became dizzy while climbing a ladder and fell to the floor, suffering a permanent back injury. The Court held that the original injury was the proximate cause of the dizzy spells which in turn brought on the second injury. The uncontradicted evidence in the instant case of both the doctor and the claimant is to the effect that the second detachment would not have occurred had it not been for the original blow to the eye—it may also be observed that neither of the detachments would have occurred had there been no original blow.

I find the claimant to be entitled to temporary total disability compensation at the rate of $35 per week beginning January 1, 1953, to February 6, 1953—at approximately which date he reached his maximum improvement following the operation of January 8, 1953. This date is fixed by the claimant's own testimony—"Q. How long did you stay in the hospital the second time? A. Twenty-two

days, I think it was. Q. And when you got out of the hospital could you see anything with your right eye? A. No, when he first took the bandage off, and I was home a week, it was about like it is now and has been that way ever since." Claimant is also entitled to payment of medical expense incurred to the date of final hearing, April 4, 1953, and permanent partial disability compensation for loss of vision of the right eye, or 175 weeks at $35 per week as provided by the Act. The sum of $650 is a reasonable fee for the services rendered claimant in this proceeding by James S. Moody, his attorney.

It is therefore ordered that the claim against Douglas-Guardian Warehouse Corp. as employer be and the same is hereby dismissed, and that the employer Southland Frozen Foods, Inc. by its carrier, Indemnity Insurance Co. of North America—pay claimant the sum of $175 covering temporary total disability compensation for the period from January 1, 1953 to February 6, 1953; pay all outstanding and unpaid medical bills incurred in the treatment of claimant's injury and reimburse him for any expenditures made by him in that respect up to and including the date of the last hearing, April 4, 1953; pay claimant compensation for 175 weeks at the rate of $35 per week commencing February 6, 1953, representing compensation for his permanent partial disability consisting of total loss of vision of the right eye; pay claimant's attorney the sum of $650 for legal services rendered in this proceeding; and pay the costs of this proceeding.