386 So.2d 259 (1980)
FLORIDA GULF COAST SYMPHONY, INC., Petitioner,
v.
DEPARTMENT OF LABOR AND EMPLOYMENT SECURITY, etc., Respondents.
No. 79-1240.
District Court of Appeal of Florida, Second District.
March 21, 1980.
*260 G. Kristin Delano of Harris, Barrett & Dew, St. Petersburg, for petitioner.
Alex D. Littlefield, Jr., Tallahassee, for respondents.
HOBSON, Acting Chief Judge.
Petitioner Florida Gulf Coast Symphony, Inc. seeks review of a final agency order rendered by the Department of Labor and Employment Security. The contested order approved a jeopardy tax lien and jeopardy assessment against petitioner and found that both the individual musicians and the symphony conductor are employees of petitioner and not independent contractors. Petitioner was ordered to file corrected reports and pay contributions to the employment compensation fund of Florida in the amount of $28,495.54. We reverse.
After the Division of Employment Security filed a jeopardy assessment and jeopardy tax lien, petitioner filed a written protest asserting that the musicians were independent contractors and requesting a formal hearing which was duly held before a special deputy of the Department of Commerce.[1] The report and recommendation of the special deputy found that the musicians and the conductor were employees of petitioner and not independent contractors. The final order of the acting director of the Division of Employment Security sustained the special deputy's report and recommendation.

Special Deputy's Findings of Fact:
The report and recommendation, as adopted in the final order, made the following findings of fact:
Petitioner engages musicians, after auditions by the conductor, to perform professional services in the area of their expertise. Petitioner establishes the time, place and length of rehearsals for all musicians and rents the rehearsal and concert halls. The musicians consider themselves independent contractors and are engaged through a written contract.[2] The contract covers services for a concert season running from November 1 to April each year.
Under the terms of the written contract:
1) The musician agrees to appear and play in each concert on the dates and at the places arranged by the petitioner.
2) The musician agrees to rehearse for a period not to exceed three hours at such times and places as the association directs.
3) The musician must, throughout the term of his contract, be a member in good standing of the American Federation of Musicians and abide by its rules and regulations. If a musician fails to abide by all its rules, petitioner may terminate the services of the musician without any obligation other than to pay to the musician all sums due to the date of termination.
4) The musician must notify the petitioner of his inability to appear for any given reason either at a concert or rehearsal.

*261 5) The contract between the petitioner and the musician may be cancelled by either party if fourteen days written notice is provided.[3]
6) The remuneration received by each musician is individually negotiated by the musician and the petitioner.
The report further found that petitioner handles all advertising and promotion for the concerts, provides a conductor who decides what music will be played and has complete authority over the musicians while he is on the podium directing rehearsals and concerts. Petitioner's executive director is responsible for the musicians' promptness for concerts and their stage deportment.
Although petitioner owns some musical equipment valued at approximately $100,000, the musicians provide their own instruments, the value of which far exceeds petitioner's investment. Petitioner has the right to discharge a musician if he fails to appear in accordance with the contract.[4] A majority of the musicians who perform under contract with petitioner are gainfully employed elsewhere and receive a majority of their earnings from areas other than the petitioner. The musicians maintain an extremely high skill level and are free to negotiate other contracts for similar services with musical associations other than petitioner.
The report and recommendation approved by numerical reference several proposed findings of fact submitted by petitioner:
The musicians receive musical scores one week in advance of the first group rehearsal of that score. They are expected to have achieved a high degree of technical proficiency in playing the score prior to the first rehearsal. The personal practice necessary to achieve that proficiency is accomplished by the individual musician in his personal residence and not under the direction of petitioner.
Each musician determines the means by which the musical effect will be achieved in his individual practice session and petitioner has no control over this activity. The musicians practice three to four hours per day in their own homes or work places, not only on the off weeks but during rehearsal and concert weeks, as well as during the six months between seasons.
Petitioner does not attempt to regulate the time in which the individual musicians conduct their personal practice. This practice time constitutes substantially more than two-thirds of the time which the musician expends in satisfying his obligation to petitioner. The only control which conductor exercises over the musicians is related to the musical result produced and not to the means of producing it.[5]

Discussion:
There are two issues before us in this case:
I. Whether the matter of the conductor's status was properly before the special deputy at the formal hearing, and
II. Whether the agency correctly applied the law to the instant facts in order to determine the status of the musicians.
As to the first issue, the notice of hearing advised petitioner to be "ready to present evidence on whether individuals performing services as `musician' are in employment. *262 ..." This statement was insufficient to give petitioner notice that the conductor's status would be at issue. A "musician" is generally understood to be one who performs or composes music. American Heritage Dictionary, 865 (1969). Although the conductor may be a musician, this is not the primary duty associated with that position. In other words, a conductor is not hired to perform or compose music but to direct and interpret the music composed and performed by others. Therefore, we hold that the notice of hearing was insufficient to allow petitioner properly to prepare its argument, and the issue of the conductor's status was improperly considered by the special deputy and the agency. We set aside that portion of the final order which held that the conductor is an employee and not an independent contractor.
Regarding the question of the individual musicians' status, we approve the criteria used by the special deputy, but disapprove the application of that criteria to the instant facts. The accepted criteria are found in Magarian v. Southern Fruit Distributors, 146 Fla. 773, 1 So.2d 858 (1941) as follows:
In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer; and
(i) whether or not the parties believe they are creating the relationship of master and servant.
Recognizing that professional persons require special consideration in the area of "control", the special deputy cited Kay v. General Cable Corp., 144 F.2d 653 (3d Cir.1944), and Carnes v. Industrial Commission, 73 Ariz. 264, 240 P.2d 536 (1952). The Kay opinion deals with a medical doctor and notes the particular difficulty of showing "control" over the activities of a highly trained professional. In that case, the court attributed less importance to the degree of direct control over the details of the doctor's professional activities and placed greater weight on the surrounding circumstances. The fact that the doctor had no discretion as to which patients he treated; used the facilities and instruments of his employer; was subject to termination at any time, and was considered by the company to be an ordinary employee were the key factors in the court's determination that the doctor was an employee.
The Carnes decision was concerned with the status of a highly skilled welder. The court concluded that in the case of a skilled laborer, if the alleged employer has the right to direct the time and the place in which the services are to be rendered, the person to or for whom the services are to be rendered and the degree and amount of said services, then the relationship is that of employer/employee, despite the fact that the employer does not closely direct the details of the performance. "The controlling factor is: For whom is the work being performed, and who had the power to control the work and the employee?" 240 P.2d at 539.
Applying the law of Magarian, Kay, and Carnes, the special deputy found that:
1) The extent of control that the petitioner has over the musicians is considerable *263 especially when viewed in light of Carnes v. Industrial Commission, supra, and Volume 1A of Larson's Workmen's Compensation Law, Section 45.32.
2) The musicians are engaged in a distinct occupation and in many cases perform services for others.
3) As a rule, musicians are not ordinarily considered independent.
4) The musicians achieve a high level of skill but then again so do the doctors, the lawyers, the nurses, the dentists, and myriads of others. This in and of itself will not label one as an independent contractor.
5) It is true that the musicians provide their tools; that is to say, their instruments; however, this practice is common among other professionals.
6) With regard to the method of payment, the musicians are paid for the service they perform an amount agreed upon for the contract season.
7) In the instant case as was stated before, the petitioner has no business without depending upon the musicians. So, in this case then, the musicians and the conductor constitute the petitioner's ability to stay in business, a totally dependent relationship.
8) With regard to whether the parties believe they are independent, it is apparent from the record that both the petitioner and the musicians consider that there is an independent contractual relationship between the parties. Be that as it may, an independent contractor status depends not on the statements of the parties but upon all the circumstances of their dealings with each other.
The agency in its final order noted two specific areas of control which were most persuasive to the agency director: the right to fire and the interdependent relationship of the symphony and the musicians.
As an example of the "right to fire" the acting director referred to the provision in the written contract which stated that if the musician does not remain a member in good standing of the American Federation of Musicians and abide by its rules and regulations, petitioner may terminate the services of that musician without obligation other than the payment of sums due to the date of termination. We interpret this contract provision to mean that the musicians' contracts may be terminated, but certainly not without cause. This example of the "right to fire" disregards the portion of the agreement which states that the contract may be cancelled if either party gives written notice to the other fourteen days after the final concert of the next scheduled series of subscription concerts. Obviously petitioner has the right to fire a musician who violates the terms of a contract, but not without cause or proper notice. A failure by either party to abide by the terms of the contract would give the other party a cause of action for breach of contract. The cases relied on by the special deputy and the agency deal with situations where the alleged employee could be fired at any time without cause and without liability. Kay v. General Cable Corp., supra; Carnes v. Industrial Commission, supra; Mangarian v. Southern Fruit Distributors, supra.
As to the interdependent relationship that exists between petitioner and musicians, we agree that the services of the musicians constitute work in the course of petitioner's regular business. Although this element is persuasive on the issue, it is not inconsistent with the interdependent relationships which may exist between a principal and an independent contractor. For that reason, we do not agree that an interdependent relationship, in and of itself, establishes control sufficient to show an employer/employee relationship.
Although the final agency order did not set out with specificity any other bases for its final determination, we may adduce the agency's reasoning by reference to the report and recommendation of the special deputy. That report, while concluding that the musicians are employees, sets out several conclusions which we interpret as indications of an independent contractor status. *264 The most noteworthy are the conclusions that the musicians are engaged in a distinct occupation; are considered by petitioner to be independent contractors; spend more than two-thirds of their time in activities over which petitioner has no control whatsoever; are responsible for the manner in which the musical effects are achieved; supply their own instruments; receive the bulk of their income from sources other than petitioner; are paid on a per job basis, and are free to pursue other job opportunities in the music field at their discretion.
Applying the accepted criteria to the facts of the instant case and viewing the totality of the circumstances, we conclude that the musicians who perform services for petitioner meet the test for independent contractor status. Therefore, we grant the petition for review, set aside the final agency order, and remand this cause to the agency for further action not inconsistent with this opinion.
OTT, J., and HENSLEY, ROBERT E., Associate Judge, concur.
NOTES
[1] Petitioner's notice of hearing stated:

The issue is whether the Jeopardy Assessment and the Jeopardy Tax Lien executed on March 1, 1978, are correct as provided in § 443.15(2)(a)3 and § 443.15(3)(g), Florida Statutes. (To determine correctness, Petitioner should be ready to present evidence on whether individuals performing services as "musicians" are in employment pursuant to § 443.03(5), Florida Statutes, Annotated 1975.) (Emphasis added)
[2] The testimony reveals that each musician negotiates his contract with petitioner's executive director. The amount of remuneration depends on the result of these individual negotiations.
[3] The special deputy was incorrect in stating that 14 days notice is required under the contract. The time limit is actually closer to 28 days.
[4] The special deputy specifically adopted petitioner's proposed finding of fact which stated:

6. If the Florida Gulf Coast Symphony attempted to fire a musician rather than terminate the musician in accordance with the terms of paragraph 5 of the agreement, the symphony would be liable to the musician for an action of breach of contract, and the musician would be entitled to receive breach of contract damages equal to the amount he could have earned under the contract for a period of not less than one month which is one-sixth of the entire concert season.
[5] These adopted facts were mentioned in the special deputy's report by number. The final agency order stated that these facts were reviewed by the agency director but were not as convincing as the facts more fully set out in the report and recommendation.