MOLETON v. UNION PAC. R. R. CO. et al.

No. 7379.  Decided June 29, 1950  (219 P. 2d 1080.
Rehearing denied Sept. 28, 1950. Certiorari denied by U. S. Supreme Court Feb. 26, 1951.

108

See 56 C. J. S., Master and Servant, Sec. 179. Employee of express company renting and servicing cars, not within Federal Employers' Liability Act. 10 A. L. R. 2d, 1279. See, also, 35 Am. Jur. 838.

*Rawlings, Wallace, Black & Roberts, Dwight L. King, Wayne L. Black,* all of Salt Lake City, for appellant.

*Bryan P. Leverich, A. U. Miner, M. J. Bronson, Howard F. Coray,* all of Salt Lake City, for respondents.

PRATT, Chief Justice.

This is an appeal from a judgment dismissing plaintiff's action on motion for non-suit against defendants for $100,-000 damages for injuries received by plaintiff while working in the yards of the defendant railroad company at Laramie, Wyoming, on the 22nd day of November, 1945.

The foundation of the causes of action alleged is that plaintiff was an iceman employed to, among other things, descend into bunkers on refrigerator cars to regulate burning heaters which generate carbon-monoxide gas. Plaintiff was 53 years of age at the time. He climbed upon the cars by means of a ladder and opened the necessary plug or hatch. He then proceeded to two other cars and opened one plug on each. In performing this work he walked along the top of the cars and did not dismount. The opening of the plugs was to let the carbon-monoxide gas out, and to enter the bunkers to get at the heater. Returning to the first car, after about four minutes taken up in opening plugs and passing from one car to the other, he descended by means of a ladder and shut off the burning heater of the first car. He climbed out of the bunker, closed the plug and proceeded on to the next car. Here he repeated the same performance; and then proceeded to the third car which he estimated had by this time been open at its plug for some ten to twelve minutes. He repeated the same performance here; but when he climbed out in the fresh air and closed the plug he recalls nothing further until he regained consciousness lying on the ground near the car from which he had apparently fallen. This third car was No. FDEX9084. Plaintiff knew that the safe way to clear these bunkers of gas was to open the plugs at both ends. He did not do this in this

instance, as he claimed he was instructed by his foreman that this train was in a hurry. Furthermore, on two of the cars one each of the two plugs was sealed, and he was not permitted to break seals upon his own initiative. He could not say, however, that the car from which he apparently fell had any plug sealed.

The express company is a Utah corporation, the stock of which, with the exception of a small amount, is owned by the Union Pacific Railroad, a defendant, and the Southern Pacific Railroad. Its business is that of furnishing and servicing refrigerator cars. No member of the Board of Directors of either railroad company is a member of the Board of Directors of the express company. The details of the relationship of the railroad companies to the Express Company are set out in *Gaulden v. Southern Pacific Co.*, D. C., 78 F. Supp. 651. There appears to be no dispute as to that relationship in this case.

At the time of the receipt of his injuries, plaintiff was in the employ of the express company, having worked for them since 1925. He was not on the payroll of the railroad company, but was paid by the express company. If there had had been an occasion to discharge him, it would have been done by the express company. The foreman of the express company told him what to do. The rules of conduct of the employees were promulgated by the express company, such, for instance as a safety rule 19d, which provides:

"When inspecting cars or lighting heaters at regular inspection points, not less than two employees must work together for each other's protection."

The express company dealt in the same way with other railroads, not stockholders of its stock—such for instance as the Western Pacific and the Mexican Railroad. In the yards at Laramie, however, the Union Pacific Railroad, a defendant herein, was the only one with whom it dealt—and was the only railroad there.

Information as to the character of service desired by the

shipper was conveyed to the express company by the railroad company, on what is called "consists."

The Laramie yards are approximately two miles long and two blocks wide, and the defendant railroad is the only one running cars in and out of there. They own the tracks. It is a terminal station for change of engines and for inspection of perishable goods. These commodities are iced, and the heaters and ventilators regulated there. This is all done by the express company. The refrigerator cars used may be actually owned by any one of a number of companies. The one upon which plaintiff was engaged in the performance of his duties—numbered above—did not belong to the express company, but was owned by the Fruit Growers Express, a company not involved in this controversy. The express company has a couple of desks in the yard office, over which its affairs are handled, and a shed in the yard from which this work was done. This shed was called a "duckhouse."

Now as to the chronology of events that led up to plaintiff's climbing upon the cars to perform these duties.

From the waybills given him, the conductor of the train —a railroad employee—made up his switch list. The switch list contained information about the content of the cars in his train including directions as to perishable goods. He left a copy of the list at a station in advance of his arrival at Laramie. The content of the list was telegraphed or telephoned to the yard office at Laramie. From this information the "consist" was made up, and a copy delivered to the chief clerk of the Express Company in the railroad yard office. He in turn delivered this information by telephone to the express company foreman, who gave the instructions to the plaintiff. Roughly speaking, then, the duties of the railroad employees pertained to the maneuvering of and the spotting of the cars and train sections; while those of the Express Company dealt with the preservation of the perish-

able foods. These latter duties contemplated, in this instance, the shutting off of the burners in question, the duty the plaintiff was engaged in doing at the time of his injury.

In their brief counsel for plaintiff have this to say: "However, on this appeal we are only interested in the first cause of action."

We shall limit our discussion to that cause. It is founded upon the idea that plaintiff in the performance of this duty was, in reality, performing the work of the railroad company, and therefore his case should be decided under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

Now as to plaintiff's Point I: Plaintiff emphasizes the name of the switch list and the instruction thereon as evidencing the fact, as he claims it to be, that he was doing the work of the railroad. We quote that name and the instruction as plaintiff has set it out in his brief:

"Switch List And
Service Instructions
Perishable Freight"

[In the upper right-hand corner is the following:]

"To Agent Or Inspector

"Carload Perishable Freight must be serviced in accordance with way-bill instructions shown below. Position of ventilators is to be recorded under 'Arrival' and 'Departure' columns, show 'O' for Open, 'C' for Closed."

How does a court determine whose work is being done under circumstances such as these? In the case of *Linstead* v. *Chesapeake & O. Ry. Co.*, 276 U.S. 28, 48 S.Ct. 241, 243, 72 L.Ed. 453, the court says of such a problem—quoting from *Farwell* v. *Boston & W. R. R.*, 4 Metc., Mass., 49, 38 Am.Dec. 339—that it is a question: " * * usually answered by ascertaining who has the power to *control* and *direct* the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary

cooperation, where the work furnished is part of a larger undertaking." (Italics added).

The use of the words *control* and *direction* are not always as clear as, at first blush, they appear to be. The case of *Jones v. George F. Getty Oil Co.,,* 10 Cir., 92 F.2d 255, gives a rather lengthy discussion of this problem, citing some of the cases cited in the present briefs. There is an implication in that case, in its reference to the opinion rendered in the case of *Denton* v. *Yazoo, & M. V. R. Co.,* 284 U.S. 305, 52 S.Ct. 141, 143, 76 L.Ed. 310, that control should be considered in the light of whether the instructions (as to servicing the cars in this case) came from the railroad as orders or commands of what shall be done, or merely as information (of what the shipper requires to be done). We have in mind particularly this quotation:

"* * * In each of these cases [*Standard Oil Company* v. *Anderson;* supra, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480, and *Driscoll* v. *Towle,* 181 Mass. 416, 63 N. E. 922] the facts plainly demonstrated that the work was that of the general master, and that in doing it, the servant had not passed under the direction and control of the person for whom the immediate work was being done; the latter being looked to not for commands, but for information."

The expression "must be serviced in accordance with waybill instructions shown below" found in the instruction quoted above from the switch list, if considered in the light of those waybill instructions establish a "must" as to results, not a process of control of performance of the duty. This, in effect, is the passing of information along from shipper to the express company. Using the thought expressed in the quotation from the *Linstead* case above, this statement does not evidence an intention to exercise the "power to *control* and *direct* the servants in the performance of their work."

In the case of *Gaulden v. Southern Pacific Co.,* D.C., 78 F. Supp. 651, 657 which was upheld on appeal to the United States Court of Appeals, Ninth Circuit, 174 F. 2d 1022, the

present express company defendant, and its stockholder, the Southern Pacific Co., were involved in a case in many ways like this one. There an iceman was injured too, but he was engaged in work in the icing yard and plant owned by the express company. He was engaged in unloading ice from the refrigerating car owned by the express company. While he was engaged in moving an empty car from a loading platform, he was struck by a loaded car being drawn up to the loading platform by a cable and winch. In one sense that case is stronger in plaintiff's favor than this, as the court held that the movement of cars was the duty of the railroad, and plaintiff was engaged in moving an empty car into a loading position. The court held, however, that plaintiff's actions were not as a special employee of the railroad company. Upon that point the court had this to say: "The contention, that plaintiff's activities at the time of the accident were in connection with a railroad movement, in unsubstantial. It is true at the time one car was being manually pushed away from the loading platform, while another was being driven up by a cable and winch. A railroad movement connotes something more than the mere movement of a car over a rail. Certainly this it not enough to constitute common carriage by rail."

This court has considered five elements in determining the question: (1) the selection and employment of the servant; (2) the payment of his wages; (3) the power to discharge the servant; (4) the power to control his actions; and (5) the person whose work is being done by the servant. *Murray v. Wasatch Grading Co.*, 73 Utah 430, 274 P. 940. The first four of these, clearly, under the facts of the present case, point to the express company as the responsible employer. As to the fifth, we believe, in this case, that the express company was the one whose work was being done. Of course, the railroad will ultimately benefit from it; but we do not believe that anyone concerned thought the railroad was performing the services, and merely took on

the express company for the purpose of acquiring the use of their employees. It is, in a sense, a specialized service which has been recognized as such for years.

The first point we decide adversely to plaintiff.

Point II, as taken from appellant's brief is as follows: "The arrangement whereby defendant railroad company seeks to have employees of the Express Company and not its own employees perform necessary services on its interstate trains and cars is a contract or device in violation of 45 U. S. C. A. Section 55."

This point is rather well answered in the Gaulden case cited above. There the court said this:

"Section 5 of the Federal Employers' Liability Act, 45 U. S. C. A. § 55, provides as follows: 'Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void.'

"The creation of the Pacific Fruit Express Company, although intended to further the transportation business of its two railroad stockholders, occurred before the Act was passed. There is therefore no basis for a charge that creation of Pacific Fruit Express Company violated Section 5. *Chicago, R. I. & P. R. Co.* v. *Bond,* 240 U. S. 449, 36 S. Ct. 403, 60 L. Ed. 735; *Robinson* v. *Baltimore & O.,* 237 U. S. 84, 35 S. Ct. 491, 59 L. Ed. 849; *Wells Fargo & Co. v. Taylor,* supra [254 U. S. 175, 41 S. Ct. 93, 63 L. Ed. 205]."

Point III, quoted from appellant's brief is as follows: "The defendant express company at the time of plaintiff's injuries was a common carrier by railroad in interstate commerce."

This point we believe is also answered by the Gaulden case, wherein it was said: " * * * There does not seem to be any doubt at all that the business of renting

refrigerator cars to railroads or shippers and providing protective service in the transportation of perishable commodities is not of itself that of a common carrier by railroad. *Ellis* v. *Interstate Commerce Commissioner,* 237 U. S. 434, 35 S. Ct. 645, 59 L. Ed. 1036; *United States* v. *Fruit Growers Express Co.,* 279 U. S. 363, 49 S. Ct. 374, 73 L. Ed. 739; *Wells Fargo & Co.* v. *Taylor,* 254 U. S. 175, 41 S. Ct. 93, 65 L. Ed. 205; *United States ex rel. Chicago, New York & Boston Refrigerator Company* v. *Interstate Commerce Com.,* 265 U. S. 292, 44 S. Ct. 558, 68 L. Ed. 1024; *Reynolds* v. *Adison Miller Co.,* 143 Wash. 271, 255 P. 110."

Point IV raised by appellant is as follows: "There was sufficient evidence introduced in this case to support a finding that the defendants were negligent and that such negligence contributed in whole or in part to the injuries suffered by plaintiff."

This point raises the question of the negligence with which the defendants are charged. The first cause of action, the only cause with which we are concerned, charges: (a) a failure to furnish plaintiff a safe place to work; (b) failure to provide any means of removing the obnoxious carbon monoxide fumes; (c) ordered plaintiff to service and adjust the charcoal burners without help or assistance from any other employee; (d) allowing gas to so accumulate. There was a safe means of working in the manner plaintiff attempted; but he failed to carry it out. A means of cleaning the bunkers of obnoxious gas was available, had plaintiff properly applied it. But there is no question that the rules were disobeyed in sending plaintiff upon this duty without assistance. However, there is no explanation present in the case of how the situation would have been different and the injury not suffered had he been assisted by another employee. The result is that there is a link missing in plaintiff's efforts to connect the negligence mentioned in (c) with the resultant fall and

injury. We are constrained to disagree with plaintiff on this point.

Judgment of the lower court is affirmed. Costs to respondent.

WADE, WOLFE, LATIMER and McDONOUGH, JJ., concur.