288 P.2d 684

Harry B. DUNHAM and American Associated Insurance Companies, Plaintiffs-Appellants,

v.

Billy WALKER, an Individual, d/b/a Billy Walker Trucking Company, Defendant-Appellee.

No. 5952.

Supreme Court of New Mexico.

Oct. 4, 1955.

L. George Schubert, Hobbs, for appellants.

Neal & Girand, Hobbs, for appellee.

SADLER, Justice.

The plaintiff below and his co-plaintiff, the employer's carrier of workmen's compensation insurance, appellants here, seek a recovery of damages from defendant, Billy Walker, doing business as Billy Walker Trucking Company, the former by way of compensation for injuries claimed to have been negligently inflicted on him in an accident arising out of and in the course of his employment; the latter by way of reimbursement to it for workmen's compensation paid plaintiff by reason of his said injuries. The trial court having directed the jury to return a verdict for defendant when the plaintiff rested, judgment pursuant to such verdict was rendered in his favor. This appeal has followed.

At the time of his injury, on March 1, 1953, the plaintiff was an employee of the Howard P. Holmes Drilling Company, operating in Lea County, New Mexico. While on the premises of his employer, an employee of defendant was also present, and at the moment using one of its trucks with a winch attachment in unloading heavy sills from a float. The front end of defendant's truck suddenly started to ascend from the ground while the sills, consisting of rig lumber, were being unloaded from the float. The plaintiff, thinking he could hold the truck down by the weight of his body, stepped on the truck's bumper. However, the front of the truck began such a rapid ascent that plaintiff, who

might earlier have stepped from his perch without risk of injury, became fearful he might be injured by a jump and remained on the bumper, intending when it became stationary, to crawl down the side of the truck. Standing on the bumper in the position he was, the plaintiff was able to observe the driver of the truck through its windshield. He testified:

"Q. Relate to the jury the circumstances involving your injury; about the accident, how it happened. A. About the accident. We were unloading a float load of rig lumber at Howard Holmes Yard, and it was to gin trucks backed up to this float load of rig lumber, they picked it up off of the float and the float pulled out from under this load which was pulled up pretty high on the gin pole, pretty high up on the float, and this happened while these trucks were being readied to back up about 15, 20 feet to unload this load of lumber. The smaller of the two trucks was light on the front end, and I stepped onto the bumper. My eight there would let this truck come back down to where the driver would have a reasonable traction there to back up so he could handle his truck. And, after I stepped up on the truck, and was started to back up, it started to rear up due to this load on the gin pole. And, as it started to rear up, and I noticed it was rearing up, I was possibly eight to ten feet from the ground. I thought it would be better to hold onto the grilling or guard of it and stay where I was. And, when the truck came to a stop—I'd say at approximately a 45-degree angle—that's what I figured due to the load, the height of the load that they were picking up; and the gin poles, the slope they had, I figured it would stop at about that angle. I thought it would be better to stay there until the truck stopped and then climb down the side of the truck and get off, and the truck driver could then do whatever he saw fit and let the truck back down. And, as the truck got to the top, I was looking down through the windshield, of course, at the driver, and I could see him working at his power take-off lever, and the load, the truck, just as it got to the top, stopped for just an instant I would say. I could hear the motor labor and at that time the winch line broke and the next thing that I knew I was in the hospital."

Further details of the accident are to be found in the recitals of the plaintiff, testifying in his own behalf on cross-examination, as follows:

"By Mr. Neal:

"Q. Mr. Dunham, on the 1st of March of 1953, when you received this injury, you were engaged in pushing tools for Howard Holmes, weren't you? A. That's right.

"Q. You were at the Howard Holmes' yard at Hobbs? A. Yes, sir.

"Q. Now, at that time, Mr. Ross Solomon was the assistant drilling superintendent for the Howard Holmes Drilling Company, was he not? A. Yes, sir.

"Q. Shortly before the incident which you related to the jury occurred, some Billy Walker trucks had been in the yard unloading, had they not? A. They had unloaded some loads, yes, sir. .

"Q. In other words, there had been some Billy Walker trucks in the yard that had unloaded some loads off of those trucks, the Walker trucks? A. Yes, sir.

"Q. Now, at the time that this occurred, all of the Walker trucks except the one that was involved in this lifting you have described had left the yard, hadn't they? A. No, sir, I don't think so.

"Q. You are not sure about that, are you? A. I am not sure, no, sir.

"Q. The only Walker truck involved in this accident was the one being driven by a man by the name of Gray, was it not? A. I believe that is the boy's name. I'm not acquainted with him.

"Q. Now, these sills that were being unloaded were very heavy? A. That is right.

"Q. They were oil soaked and water soaked? A. They were oil soaked and water soaked.

"Q. *Now, those sills were being unloaded from a Howard Holmes truck, were they not? A. I'm not sure.*

"Q. *Now, aren't you positive that those sills were on a Howard Holmes truck? A. I'm not positive.*

"Q. *And were being unloaded from a Howard Holmes truck? A. I'm not positive.*

"Q. *Because there was no Billy Walker truck, was there? A. I'm not positive it wasn't.*

"Q. *It was a Howard Holmes truck, wasn't it? A. I don't think so.*

"Q. *As a matter of fact, don't you know it was a Howard Holmes truck? A. I do not know it.*

"Q. The only truck that was hooked onto this load, who owned it? A. I think Billy Walker because—

"Q. You mean to tell this jury that both these winch trucks were Billy Walker trucks? A. I am not sure but I think that both of them were Billy Walker trucks. (Emphasis ours).

\* \* \* \* \* \*

"Q. Now, at the time that this incident occurred, there were two winch trucks hooked onto this load, weren't there? A. That's right.

"Q. Now, who had directed the trucks how to hook onto that load? A. I suppose, Ross Solomon.

"Q. Did you? A. No, sir.

"Q. You were there in a supervisory capacity, weren't you? A. I wouldn't say that.

"Q. Well, you were the tool pusher? A. I was the tool pusher, yes, sir.

"Q. And Ross Solomon was the Assistant Drilling Superintendent? A. That is right, and he was there too. He and Buster Florence both were drilling superintendents.

"Q. They were both there? A. Yes, sir.

"Q. Now, didn't Buster Florence come up after this accident occurred? A. No, sir.

"Q. Didn't Buster Florence come up just as the accident occurred? A. Buster Florence come up and said he knew when I stepped on the front of the truck."

The plaintiff further testified:

"Q. But you don't know whether the other truck was a Walker truck or a Howard Holmes Truck? A. I'm not positive. I'm not positive it was a Howard Holmes truck or I'm not positive it was Billy Walker's truck.

"Q. Neither do you know about the load—the truck that was on the other side? A. I think it was a Howard Holmes truck that was loaded with the lumber, the float load.

"Q. But you thought that Ross Solomon was the man in direction of the work, of the method of doing the work? A. I would say Ross Solomon was in charge of the work above me.

"Q. What happened to the other truck when the Walker line broke? A. I don't know.

"Q. You don't know because you

had been thrown off? That's right." (Emphasis ours).

While the testimony is not clear and is more or less confusing throughout due to plaintiff's evasiveness and asserted ignorance of important details, indisputable facts emerge and appear controlling. We now recite them. The accident resulting in plaintiff's injuries occurred on the premises of his employer, the Howard P. Holmes Drilling Company. The immediate task in hand was unloading some rig lumber, to wit, oil and water soaked sills, the property of Holmes Drilling Company, from a float truck. In the work of unloading, a winch truck belonging to Billy Walker, the defendant, and another truck as to whose ownership plaintiff disclaims knowledge, were being used to hoist the heavy timbers off the float and lower them to the ground.

No employee of the defendant, other than the driver of the Billy Walker truck on which plaintiff was injured was on the premises. At least, none was identified as being present. Every person present, except driver of the Billy Walker winch truck, was an employee of Howard P. Holmes Drilling Company, for which company the sills were being delivered. These employees were Ross Solomon and Buster Florence, drilling superintendents for Holmes, as well as the plaintiff himself, a tool pusher. Asked if there was a Billy Walker pusher there, plaintiff replied, "Not that I know of."

At the time of plaintiff's injury the Billy Walker truck had already unloaded and having done so was ready to leave the Howard Holmes yard when the aid of its driver apparently was invoked to assist in unloading the float in question by the Howard Holmes employees, including its drilling superintendent. This fact appears by testimony so compelling as to be unanswerable. No tool pusher or person in supervisory capacity working for Billy Walker other than the driver of the winch truck involved, was then or at any other time identified as being present, or thereabouts. The only supervisors on the job were the three supervisors for Howard Holmes, Ross Solomon, Buster Florence and the plaintiff himself. They and they alone had any direction of the work in hand. Note these words from plaintiff:

"Q. Now, who had directed the trucks how to hook onto that load? A. *I suppose, Ross Solomon.*

*   *   *   *   *   *

"A. *Buster Florence come up and said he knew when I stepped on the front of the truck.*

"Q. Now, he wasn't directing anything in the way of doing the work, was he, Buster Florence wasn't? A. *I would think that he would be supervisor, yes, sir.*

"Q. The only supervisors that were there then were you and Buster Florence and Solomon? A. Ross Solomon and Buster Florence were both my superiors.

"Q. You were there? A. Yes, sir.

"Q. Now, there was no Billy Walker pusher there, was there? A. Not that I know of.

"Q. Now, then, when you hooked these trucks onto this load, either you or Ross Solomon or Buster Florence told them how they wanted them hooked on, didn't they? A. I don't remember as anyone told them anything.

"Q. Well, somebody was directing the manner of doing the work. A. *Well, that would be Ross Solomon, I suppose.*

*   *   *   *   *   *

"A. I think it was a Howard Holmes truck that was loaded with the lumber, the float truck.

"Q. But you thought that Ross Solomon was the man in direction of the work, of the method of doing the work? A. *I would say Ross Solomon was in charge of the work above me.*" (Emphasis ours).

■ · It being so obvious from foregoing testimony that the Billy Walker winch truck was detained under the circumstances shown to assist in the work of unloading sills from a Howard Holmes truck, and all details and direction of the work being under the direct supervision of two drilling superintendents and a tool pusher of the Howard Holmes Company, it is easy to understand the contention of counsel for defendant, with which we are compelled to agree, that for purposes of the work underway, the driver of the Billy Walker truck became a special employee of Howard Holmes Drilling Company. If he was, then his acts became those of his special employer by reason whereof no liability in the premises can attach to Billy Walker for the negligence, if any, of the driver of the Billy Walker winch truck so engaged.

The case most strongly relied upon by counsel for the defendant is so nearly in point on its facts as to suffice in and of itself to support the action of the trial court in directing a verdict for defendant when the plaintiff rested his case in chief. We refer to the case of Jones v. George F. Getty Oil Company, 10 Cir., 92 F.2d 255, 258, which arose on facts occurring in New Mexico, resulting in the affirmance of a judgment of the District Court of New Mexico for the District of New Mexico.

It may be well to recite the controlling facts in the Getty Oil Company case. The latter company owned, controlled and operated a 40-acre tract of land upon which

were located three water wells and numerous oil wells which it maintained. It made a contract with one E. C. Norwood to sell him specified quantities of water for the latter's drilling operations. On the date in question, April 8, 1934, the three water wells had become out of repair and ceased to pump water. This prevented Norwood from continuing the drilling of oil wells, no other source of water being available. In such circumstances Norwood along with his foreman, Bill Wood, instructed plaintiff, Jones, and other employees to accompany him (Bill Wood) upon the 40-acre tract of defendant to repair the wells mentioned.

The voluntary entry on defendant's premises by Bill Wood and his crew, including plaintiff, was with the consent of defendant, acting through its lease superintendent, Stewart, in charge of its premises. The suit in question was a common law action for damages. The court held there was no liability therefor, the plaintiff becoming a special employee of defendant whose sole liability was under the New Mexico Workmen's Compensation Law. The details of the accident which resulted in plaintiff's injuries for which damages were sought against defendant, owner of the wells in question, are disclosed by the following quotations from the opinion of the United States Circuit Court of Appeals for the 10th Circuit, of which New Mexico is a part, to wit:

"Immediately after Norwood's crew came on the work, Norwood's foreman directed plaintiff to climb the 'gin pole,' attach a block to the top thereof and feed a pulley through the block. Plaintiff was standing near the top of the pole, pursuant to the aforesaid order, when a guy wire broke, allowing the pole to fall, injuring the plaintiff; it being alleged that the guy wire was broken through negligence of certain of defendant's employees.

"There is no allegation negativing defendant's power to control the work or allegation that Norwood's crew took charge of the work.

"If plaintiff was a temporary employee of defendant, then the latter's sole liability to him is under the New Mexico Compensation Act; no common-law liability having application. The work being done was defendant's work. Norwood's act constituted a loan of his employees to defendant to assist, plaintiff being a temporary employee of defendant. *If Norwood's men were mere volunteers, no common-law liability attached.* The only duties under such circumstances owing by defendant to plaintiff was not to willfully or wantonly injure him or

expose him to hidden peril. 45 C.J. p. 796; p. 788, § 194.

*   *   *   *   *   *

"The controlling factor is: For whom is the work being performed, and who had the power to control the work and the employee? The authority to determine the work to be done, and the manner in which it is to be carried on, necessarily includes the right to suspend or terminate the work altogether or, possibly, to exclude the particular employee from the job, not including the right to discharge the employee from the service of his general employer (Norwood), nor need it include the actual giving of directions to the employee in connection with the work he is doing.

"Bill Wood, the foreman, and plaintiff, and the other members of Norwood's crew, had voluntarily entered upon said premises in said work with the consent of said defendant, who was the owner and in control, through his lease superintendent, Allen Stewart."

The application of controlling principles to the position of the parties is identical in the Getty case and in the case at bar. In the Getty case, if the plaintiff as a general employee of Norwood became a special employee of Getty Oil Company as to the work in hand, such company became subject to compensation under the New Mexico Workmen's Compensation law and by the same token absolved from common law liability to plaintiff for the injuries suffered by the latter. In like fashion, if the driver of defendant's winch truck in rendering the service he did in the unloading of the Holmes float truck became a special employee of Howard Holmes Drilling Company in performing the work he did, the relation of respondeat superior no longer and for purposes of that employment existed between such employee and Billy Walker and the latter could not be subjected to liability in damages for the negligence, if any, of the Billy Walker winch truck. The problem is that simple.

Every test set forth in the Getty case for determining whether the relation of special employee to the Howard Holmes Drilling Company existed is fully met in the case before us. The work being done was for the benefit of the Holmes Company. It had the power to control the work and the special employee through its supervisors on the ground. Admittedly, they directed the course of the work throughout. No other employee of Billy Walker, the general employer of the driver of the winch truck, was around or assisting in the work being done for benefit of the Holmes Company, except that driver himself.

One of the supporting cases cited and relied upon in the Getty Oil Company case is that of McLamb v. E. I. DuPont DeNemours & Co., 4 Cir., 79 F.2d 966, 967, the opinion in which contains such an illuminating discussion of the whole question that we quote therefrom at some length, as follows:

"It is of course true that 'one may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation.' Standard Oil Company v. Anderson, 212 U.S. 215, 220, 29 S.Ct. 252, 253, 53 L.Ed. 480. This is what the plaintiff claims took place in his case. However, this is but one aspect of the situation. The alternatives are presented in the following passage from the same authority, 212 U.S. 215, at page 221, 29 S.Ct. 252, 254, 53 L.Ed. 480: 'It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.'"

While an opinion by the United States Circuit Court of Appeals of which New Mexico forms a part, is not binding on this Court; nevertheless, where as well supported in reason and logic as this one, it is highly persuasive. We have not heretofore had occasion to notice the opinion in the Getty case on this exact point, though we did see fit to cite and accept it on another, in Snider v. Town of Silver City, 56 N.M. 603, 247 P.2d 178. We now accept it with equal assurance on the decisive issue before us in the case at bar. The rationale of the Getty case is truly applicable here. It persuades us to hold with the defendant that the driver of the Billy Walker winch truck was a special employee of the Howard P. Holmes Drilling Company at the time of plaintiff's injury. Hence, we are unable to hold defendant liable in a common law action for damages. It is, therefore, not anomalous to note that Holmes Company's insurance carrier seeks, in this very action, to reimburse itself the amounts paid to plaintiff in a recognition by the latter of liability for compensation to him under the New Mexico Workmen's Compensation Law. While this fact alone would not foreclose plaintiff's right to maintain the present action, it is entirely consistent and in harmony with our conclusion of nonliability on defendant's part. Before closing we shall add a few additional cases dealing generally with the question we have been considering. State Compensation Ins. Fund v. Industrial Acc. Commission, 26 Cal.2d 278, 158 P.2d 195; Moleton v. Union Pac. R. R. Co., 118 Utah 107, 219 P.2d 1080 and Carnes v. Industrial Commission, 73 Ariz. 264, 240 P.2d 536.

It follows from what has been said that the judgment of the district court is correct and should be affirmed.

It is so ordered.

COMPTON, C. J., and LUJAN and McGHEE, JJ., concur.

KIKER, J., concurring specially.

KIKER, Justice (concurring specially).

I concur in the result. My reason for so doing is that, after what I think is a very careful search of the record, I do not find sufficient evidence to support a prima facie case that defendant's negligence was the proximate cause of plaintiff's injuries. I think that the first ground of the motion made by defendant should have been sustained; I think it may well be that it was on that ground that the trial judge sustained the motion for a directed verdict. I am in serious doubt that defendant's truck driver, if defendant had a truck at the place of injury, was a special employee of Howard P. Holmes Drilling Co.