628 P.2d 337

Ivy W. DESSAUER, Personal
Representative, Plaintiff,

v.

MEMORIAL GENERAL HOSPITAL and
Glorious Bourque, Defendants and
Third-Party Plaintiffs-Appellants,

v.

Ronald J. Malleis, Third-Party
Defendant-Appellee.

No. 4637.

Court of Appeals of New Mexico.

April 16, 1981.

Jerald A. Valentine, Crouch, Valentine & Ramirez, P.C., Las Cruces, Bruce Hall, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for defendant and third-party plaintiff-appellant Memorial General Hospital.

William K. Stratvert, Alan Konrad, Miller, Stratvert, Torgerson & Brandt, P.A., Albuquerque, for third-party defendant-appellee.

Montgomery & Andrews, P.A., Albuquerque, John E. Conway, Durrett, Conway & Jordon, P.C., Alamogordo, for defendant and third-party plaintiff-appellant Bourque.

Howard F. Houk, Albuquerque, Jack M. Campbell, Bruce D. Black, Campbell & Black, P.A., Santa Fe, for amicus curiae The New Mexico Medical Society.

## OPINION

WOOD, Judge.

The personal representative of the Estate of Dessauer sought damages for wrongful death on the basis of negligence in administering a dosage of medication. The defendants were the Hospital (Memorial General Hospital) and the Nurse (Bourque), who was an employee of the Hospital. The Hospital and the Nurse filed third-party complaints against the Doctor (Malleis). The third-party claims alleged the Doctor was negligent in his care and treatment of Dessauer, and was negligent in his supervision of the Nurse. The third-party claims sought either contribution or indemnity from the Doctor. Among the defenses to the third-party complaints was the contention that negligence of each of the third-party plaintiffs was the sole cause of Dessauer's death. The Estate's suit against the Hospital and the Nurse was settled for $225,000.00, and a joint tortfeasor release was executed. The third-party contribution and indemnity claims were tried, and the jury's answers to interrogatories were to the effect that neither of the third-party plaintiffs should recover against the Doctor. The Hospital and the Nurse appeal. We (1) answer two issues summarily and discuss (2) the question of a general verdict, and (3) a refused instruction based on vicarious liability of the Doctor.

*Issues Answered Summarily*

■ (a) The trial court instructed the jury on the theories of negligence asserted against the Doctor. However, it refused requested instructions which would have told the jury that the Hospital and the Nurse sought either indemnification of the entire $225,000.00, or contribution of one-half of that amount. The refusal of these requested instructions was not error for two reasons. First, as we point out in discussing the issue involving vicarious lia-

bility, the claims of the Hospital and of the Nurse must be distinguished. The refused instructions failed to make any distinction between the difference in the relationship of the Hospital and of the Nurse to the Doctor and, in the form requested, they were incomplete statements of the law which were properly refused. Panhandle Irrigation, Inc. v. Bates, 78 N.M. 706, 437 P.2d 705 (1968). Second, the jury's answers to interrogatories determined the rights of both the Hospital and the Nurse to contribution and indemnity; if the answers had determined a right to recovery by either the Hospital or the Nurse, the amounts would have been a simple matter of accounting. If the jury should have been instructed on the facts of the joint tortfeasor settlement, a point we do not decide, the Hospital and the Nurse were not prejudiced because an accounting could have been achieved by utilization of the jury's answers. Bailey v. Jeffries-Eaves, Inc., 76 N.M. 278, 414 P.2d 503 (1966).

■ (b) The trial court instructed the jury, in accordance with the second paragraph of U.J.I. Civ. 8.1, that the only way it could decide whether the Doctor was negligent was "from evidence presented in this trial by physicians and surgeons testifying as expert witnesses." The Hospital and the Nurse assert that this was not a case for limiting the testimony to expert witnesses; rather, that the circumstances of this case permit application of the "common knowledge" exemption. See Gerety v. Demers, 92 N.M. 396, 589 P.2d 180 (1978). We disagree. This case involved emergency treatment. The Hospital and the Nurse rely on one aspect of the matter in asserting applicability of the common knowledge exemption. Singling out one aspect would have been improper because it would have ignored the fact of emergency treatment and distorted the circumstances under which an overdose of the medicine was administered. There was no error in requiring the Doctor's asserted negligence to be determined by expert testimony.

*General Verdict*

Because the issues being tried involved contribution and indemnity claims of two parties, the trial court was of the view that the best procedure would be by interrogatories which, when answered, would amount to a special verdict. Accordingly, no "general verdict" in the traditional sense was submitted to the jury.

Following are the pertinent interrogatories, and the answers thereto:

INTERROGATORY NO. 1: Was Dr. Ronald J. Malleis negligent? *Answer* —No.

. . . .

INTERROGATORY NO. 3: Was Glorious Bourque negligent? *Answer*—Yes.

INTERROGATORY NO. 4: If the answer to Interrogatory No. 3 is "yes", was the negligence a proximate cause of the death of Wiley J. Dessauer? *Answer* —Yes.

INTERROGATORY NO. 5. If the answers to Interrogatories Nos. 3 and 4 are "yes", was Memorial General Hospital negligent apart from the negligence of Glorious Bourque? *Answer*—Yes.

INTERROGATORY NO. 6: If the answer to Interrogatory No. 5 is "yes", was the hospital's negligence a proximate cause of the death of Wiley J. Dessauer? *Answer*—Yes.

The Hospital and the Nurse do not claim that the above answers were improper under the evidence. Nor do they claim that the answers would not have disposed of the case if there had been a general verdict. The contention is that the answers have no legal effect because there was no general verdict.

The Hospital and the Nurse rely on R.Civ. Proc. 49, which reads:

In civil cases, the court shall at the request of either party, in addition to the general verdict, direct the jury to find upon particular questions of fact, to be stated in writing by the party requesting the same. When the special finding of facts is inconsistent with the general verdict, the former shall control the latter,

and the court shall give judgment accordingly.

This rule is very similar to the statute enacted by Laws 1889, ch. 45. This statute is quoted in *Walker v. N. M. & So. Pac. R'y Co.*, 7 N.M. 282, 34 P. 43 (1893), and the United States Supreme Court upheld the statute, against constitutional attack, at 165 U.S. 593, 17 S.Ct. 421, 41 L.Ed. 837 (1897).

Rule of Civ.Proc. 49 refers to a general verdict and "special findings", also known as special interrogatories. A third category is the special verdict, which the trial court utilized in this case.

The United States Supreme Court opinion in *Walker v. Southern Pacific Railroad,* supra, distinguished between general verdicts and special verdicts as follows:

Now a general verdict embodies both the law and the facts. The jury, taking the law as given by the court, apply that law to the facts as they find them to be and express their conclusions in the verdict.... Beyond this, it was not infrequent to ask from the jury a special rather than a general verdict, that is, instead of a verdict for or against the plaintiff or defendant embodying in a single declaration the whole conclusion of the trial, one which found specially upon the various facts in issue, leaving to the court the subsequent duty of determining upon such facts the relief which the law awarded to the respective parties.

The distinction between a special verdict, and special interrogatories with a general verdict, is stated in *Childress v. Lake Erie & W. R. Co.*, 182 Ind. 251, 105 N.E. 467 (1914):

There is, however—

"a manifest difference between a special verdict and a finding of the facts in answer to interrogatories propounded to the jury. A special verdict is in lieu of a general verdict, and its design is to exhibit all the legitimate facts and leave the legal conclusions entirely to the court. Findings of fact in answer to interrogatories do not dispense with the general verdict. A special verdict covers all the issues in the case, while an answer to a special interrogatory may respond to but a single inquiry pertaining merely to one issue essential to the general verdict." Words and Phrases, vol. 7, p. 6596; *Morbey v. Chicago, etc., R. Co.*, 116 Iowa 84–89, 89 N.W. 105, 107.

If a jury finds on special questions of fact in answer to interrogatories, without a general verdict, the finding is of no force, and the court cannot give to the special finding any weight unless they are sufficiently numerous and explicit to leave nothing for the court to do but to determine questions of law. If they affirmatively show the existence of every fact necessary to entitle plaintiff to a recovery and the nonexistence of every defense presented under the issues, or if they show as a matter of law that a valid defense has been established by the evidence, they may then constitute a special verdict.

The distinction made in *Childress,* supra, was recognized in *Claymore v. City of Albuquerque,* (Ct.App.) Nos. 4804/4805, filed December 9, 1980 (N.M.St.B.Bull. Vol. 20 at 75). However, the distinction seems not to have been recognized in other decisions. *Bryan v. Phillips,* 70 N.M. 1, 369 P.2d 37 (1962), is a special interrogatory situation consistent with the *Childress* distinction. *Bryant v. H. B. Lynn Drilling Corporation,* 65 N.M. 177, 334 P.2d 707 (1959), seems to use special interrogatories and special verdict as interchangeable terms, contrary to *Childress.* The questions answered in *Saavedra v. City of Albuquerque,* 65 N.M. 379, 338 P.2d 110 (1959), amounted to a special verdict although referred to as special interrogatories.

*Saavedra* answers the question whether the jury's answers in this case are sustainable as a special verdict. It states:

[T]he only provision for submitting special interrogatories to a jury is when they are accompanied by a general verdict, unless the latter is waived or it is so submitted by consent.

Careful consideration has been given the contention of the defendant that what was done here amounted to a sub-

mission on a special verdict, and that such is not prohibited under our rules, but our rule 49 is too limited to allow such construction. Reversible error was committed by the action taken in this case over the objection of the claimant as he was entitled to a general verdict as a matter of right when he asked for it. Such action must be held to have been prejudicial, and this in the face of the negative answer to interrogatory No. 2, supra.

Because of *Saavedra*, supra, we cannot uphold the jury's answers in this case as a special verdict, despite Judge Sutin's apparent willingness to disregard the prohibition against special verdicts. Because there was no traditional general verdict, as explained in *Walker v. N. M. & So. Pac. R'y Co.*, supra, the question is whether the jury's answers were the equivalent of a general verdict. We particularly consider the answer to Interrogatory No. 1. If that answer was, in fact, the equivalent of a general verdict, the absence of a verdict form labeled "General Verdict" does not matter. *Brannin v. Bremen*, 2 N.M. (Gild.) 40 (1880).

The Hospital and the Nurse requested that three "General Verdict" forms be submitted to the jury. The first would have awarded $225,000.00 to the Hospital and the Nurse on a theory of indemnity. The second would have awarded $112,500.00 to the Hospital and the Nurse on a theory of contribution. As we point out in discussing the issue involving vicarious liability, the claims of the Hospital and the Nurse must be distinguished. Because the verdict forms failed to make that distinction, they were properly refused.

The third general verdict form submitted by the Hospital and the Nurse provided: "We find that the Defendant [Doctor] was free from any negligence . . . ." The answer to Interrogatory No. 1 said the same thing. This verdict form went on to state: "Plaintiffs are not entitled to recover any sum." Such is the legal effect of the jury's answer; not being negligent, the Doctor was not liable for either contribution or indemnity as an alleged tortfeasor. See *Standhardt v. Flintkote Company*, 84 N.M. 796, 508 P.2d 1283 (1973).

Because the jury's answer was determinative of the right of the Hospital and the Nurse to recover damages from the Doctor as an alleged tortfeasor, that answer is the equivalent of, and is to be given effect as, a general verdict. *Smith v. Gizzi*, 564 P.2d 1009 (Okl.1977). This result is not contrary to *Saavedra*, supra, which held that prejudice resulted from the absence of a general verdict; here we have a general verdict.

Although the foregoing disposes of this point, we recommend to the Supreme Court a change in R.Civ.Proc. 49 to permit special verdicts. We do so because (1) an Order of the Supreme Court, dated March 30, 1981, approves special verdicts in comparative negligence cases, and (2) where the jury's answers dispose of a party's right to recover, good judicial administration is not furthered by disputes over the label to be applied to those answers.

*Vicarious Liability*

Consistent with the third-party claims of the Hospital and the Nurse against the Doctor, the requested instructions and verdicts which were refused, and the instructions and interrogatories submitted to the jury were based on negligence on the part of the Doctor. The jury's answers established that the Doctor was not negligent. Negligence on the part of the Doctor is not involved in this point.

The Hospital and the Nurse requested an instruction which was adopted by the Supreme Court for use beginning April 1, 1981. The heading of U.J.I. Civ. 11.14 is: "Liability of Operating Surgeon—Agency (Captain of Ship Doctrine)". This heading resulted in extensive discussion in the briefs of the special agency rule called "Captain of the Ship". This label was recognized, at the oral argument, to be inappropriate and misleading because the contents of the instruction did not contain this special agency rule. See *Sparger v. Worley Hospital, Inc.*, 547 S.W.2d 582 (Tex.1977). We point this out to emphasize that the requested instruction does *not* involve the Captain of the Ship Doctrine.

The instruction requested read:

A doctor who has the right to control and supervise the activity of assistants, nurses and others, is responsible for negligent acts or omissions of any such person during specific treatment under the immediate and direct control and supervision of the doctor.

The Hospital and the Nurse contend this instruction is no more than the borrowed servant or special employee doctrine approved in *Dunham v. Walker*, 60 N.M. 143, 288 P.2d 684 (1955). The claim is that this doctrine also applies in situations involving doctors, *Sparger v. Worley Hospital, Inc.*, and the trial court erred in refusing this requested instruction.

It is unnecessary to decide whether the borrowed servant doctrine applies in medical malpractice cases where an injured plaintiff is seeking its application. We assume that it does apply. This, however, is not a case where an injured party is seeking its application; the Estate has settled its claims against the Hospital and the Nurse. This case involves contribution and indemnity. Whether a borrowed servant instruction would have been appropriate depends upon the nature of the liability stated in the requested instruction, and the application of contribution and indemnity law to that liability.

■ The requested instruction, quoted above, would make the Doctor liable for the negligence of the Nurse in this case. Liability to an injured party may be imposed by the doctrine of *respondeat superior. Romero v. Shelton*, 70 N.M. 425, 374 P.2d 301 (1962). Liability under this doctrine is a form of vicarious liability. When vicarious liability is imposed upon the master (in this case, the Doctor), the liability "has nothing to do with fault" and, whatever the rationalization, seems to be imposed in order to assist an injured person to collect any damage award from a deep pocket. James, *Vicarious Liability*, 28 Tul.L.Rev. 161 (1954).

■ The fact that the Doctor could be held vicariously liable to the injured party for the Nurse's negligence requires that the claim of the Hospital and the Nurse be distinguished.

The claims were for contribution and indemnity. The distinction between these claims must also be made. "[T]he difference between indemnity and contribution in cases between persons liable for an injury to another is that, with indemnity the right . . . enforces a duty on the primary wrongdoer to respond for all damages; with contribution, an obligation is imposed by law upon one joint tortfeasor to contribute his share to the discharge of the common liability." *Rio Grande Gas Company v. Stahmann Farms, Inc.*, 80 N.M. 432, 457 P.2d 364 (1969). Indemnity is not allowed, however, when the parties are in *pari delicto. Standhardt v. Flintkote Company*, supra; *Harmon v. Farmers Market Food Store*, 84 N.M. 80, 499 P.2d 1002 (Ct.App.1972). Contribution is not allowed unless the party seeking contribution has paid more than its pro rata share. Section 41–3–2(B), N.M.S.A.1978; *Commercial U. Assur. v. Western Farm Bur. Ins.*, 93 N.M. 507, 601 P.2d 1203 (1979). The concepts of contribution and indemnity are "deeply rooted in the principles of equity, fair play and justice." *Aalco Mfg. Co. v. City of Espanola*, 95 N.M. 66, 618 P.2d 1230 (1980).

*The Nurse*

■ A common example of indemnity is "where a blameless employer recovers from a negligent employee, after the employer has been held liable to the injured third person upon the theory of respondeat superior." *Rio Grande Gas Company v. Stahmann Farms, Inc.*; see *Employers' Fire Insurance Company v. Welch*, 78 N.M. 494, 433 P.2d 79 (1967). Here we have the converse. The Nurse, who settled the Estate's liability claim against her, seeks indemnification from the Doctor on the basis of *respondeat superior*. Being the primary wrongdoer, she had no claim for indemnification. *Rio Grande Gas Company v. Stahmann Farms, Inc.*, supra; 1 Mechem on Agency § 1608 (2d ed. 1914); see Prosser, Law of Torts § 51 (4th ed. 1971).

■ Nor can the Nurse obtain contribution from the Doctor because the Doctor's liability, as a tortfeasor, see § 41–3–1, N.M.

S.A.1978, under *respondeat superior*, is based on the Nurse's negligence. *Melichar v. Frank*, 78 S.D. 58, 98 N.W.2d 345 (1959), approved the following from a Uniform Laws publication: " 'Where a master is vicariously liable for the tort of his servant, the servant has no possible claim to contribution from the master . . . .' " If the negligence of the Nurse were eliminated, the Doctor would not be liable at all. It is not equitable to require the Doctor to contribute to the Nurse when the contribution would be based on the Nurse's negligence. *Larsen v. Minneapolis Gas Company*, 282 Minn. 135, 163 N.W.2d 755 (1968); see *Aalco Mfg. Co. v. City of Espanola*, supra. The Nurse had no claim for contribution from the Doctor.

The law does not grant to the servant the same right given to the party injured by the servant's negligence. As we have already noted, the doctrine of vicarious liability developed to provide recovery to plaintiffs injured by servants who (1) were about their masters' business, and (2) were unable to respond in damages themselves. The combination of those circumstances produced what *Prosser* calls "a rule of policy, a deliberate allocation of a risk" because "it is just that he [the master], rather than the innocent injured plaintiff, should bear [losses caused by the torts of servants] . . . ." *Prosser*, supra, § 69 at 459. Nevertheless, *Prosser* also points out in his treatise, § 51 at 311, that "there may be indemnity in favor of one who is held responsible solely by imputation of law because of his relation to the actual wrongdoer, as where an employer is vicariously liable for the tort of a servant . . . ."

If the master may obtain indemnity from a servant, for whose tort the master has responded in damages, it is totally illogical to think the servant may claim a right to contribution or indemnity from the innocent master once the servant has paid his liability to the injured plaintiff. The doctrine of vicarious liability was fashioned to provide a remedy to the innocent plaintiff, not to furnish a windfall to a solvent wrongdoer.

*The Hospital*

In considering the Hospital's claims, we reiterate that no negligence of the Doctor is involved; the Hospital's claims against the Doctor are based on his assumed vicarious liability for the Nurse's negligence. The Doctor cannot be liable to the Hospital unless the Nurse was liable to the Hospital. See U.J.I. Civ. 4.3 and 4.6. Unless the Hospital has a claim against the Nurse, it has no claim against the Doctor. *Larsen v. Minneapolis Gas Company*, supra.

At the time the requested instruction was refused, the Doctor was claiming that both the Hospital and the Nurse were negligent; this claim was subsequently established by the jury's answers to the interrogatories. Indemnity is allowed against the primary wrongdoer and not against a tortfeasor in *pari delicto*. *Standhardt v. Flintkote Company*, supra; *Harmon v. Farmers Market Food Store*, supra. The Hospital had no indemnity claim against the Nurse as a joint tortfeasor; the Hospital made no claim at the trial that, as between the Hospital and the Nurse, the Nurse was the primary wrongdoer. The Hospital's allegations being insufficient to show an indemnity claim against the Nurse, the Hospital's indemnity claim against the Doctor was also insufficient.

The Hospital's contribution claim against the Doctor was based on the negligence of the Nurse. Similarly to the indemnity claim, the Hospital made no claim at the trial that the Nurse was a joint tortfeasor with the Hospital. However, because the jury's answers to interrogatories subsequently established that the Hospital and the Nurse were joint tortfeasors, we assume that at the time the instruction was refused, a contribution claim against the Doctor, on the basis of the Nurse's negligence, was before the trial court. Such a claim would be for the Nurse to contribute to the Hospital her pro rata share; or, stated another way, that the Hospital had contributed more than its pro rata share. Section 41–3–2(B), supra; *Commercial U. Assur. v. Western Farm Bur. Ins.*, supra.

The record shows that the Hospital and the Nurse had paid $225,000.00 to the Estate, but there is nothing to show which of the two made the payment. Nor is there a claim that the Nurse's part of the $225,000.00 was less than her pro rata share. The Doctor, if liable under any theory, would be in the same position as the Nurse. *Larsen v. Minneapolis Gas Company*, supra. Thus, the Hospital's contribution claim against the Doctor was also insufficient to support a vicarious liability instruction, directed to the Doctor, at the time the instruction was refused.

█ No instruction told the jury that the Doctor could be held liable for the Nurse's negligence. There being a failure to instruct, the Hospital was required to tender "a correct instruction". R.Civ.Proc. 51(I). An incorrect instruction is properly refused. *Panhandle Irrigation, Inc. v. Bates*, supra. The requested instruction was properly refused because it was incorrect. It was incorrect because (1) it failed to distinguish between the claims of the Hospital and the Nurse; (2) it failed to distinguish between contribution and indemnity; and (3) the instruction was inapplicable, in this case, under all of the distinctions.

The judgment of the trial court is affirmed.

The Hospital and the Nurse are to bear their appellate cost.

IT IS SO ORDERED.

WALTERS, J., concurs.

SUTIN, J., concurs in result.

SUTIN, Judge.

I concur in the result.

### INTRODUCTION

Judge Wood's opinion, concurred in by Judge Walters, replaced mine because our views, with respect to the important issues raised by plaintiffs, differ, a commonplace. Points raised in this appeal should be answered perspicaciously to advise the parties, the bench and bar of the basis for the result reached.

With all due deference, Judge Wood did not set forth the issues nor explain their significance. Applicable law has been misplaced. Two crucial issues have been erroneously resolved; (1) The general verdict vs. special verdict as applied to Rule 49 of the Rules of Civil Procedure. If Judge Wood's opinion remains the law, except in comparative negligence cases, the concept of a "special verdict" has been outlawed in New Mexico. (2) The doctor-nurse relationship in treatment of patients and the liability of hospital-nurse-doctor to one another in the treatment of a patient. These issues were not adequately discussed. The resolution of this important, decisive issue, is one of the foremost problems in New Mexico and the country.

The failure to resolve these issues with certainty, leaves them in abeyance. To decide issues summarily, to fail an answer to crucial issues, to resolve issues vaguely and technically, to erroneously state the law to escape a harsh result, contributes nothing to judicial law. It demeans the efficacy of the opinion. As Judge Frank, dissenting, said in *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 661 (2d Cir. 1946):

> The practice of this court—recalling the bitter tear shed by the Walrus as he ate oysters—breeds a deplorably cynical attitude toward the judiciary.

My opinion follows:

Ivy W. Dessauer, as personal representative of the estate of Wiley J. Dessauer, filed her Complaint against Memorial General Hospital and its employee Glorious Bourque, alleging defendants' negligence and that such negligence was the proximate cause of the death of decedent. Defendants filed Third Party Complaints against Dr. Ronald J. Malleis alleging negligence and claiming that his liability was that of a joint tortfeasor; it was further alleged that Dr. Malleis was the sole proximate cause of the death of the decedent and should be held liable for damages found due to plaintiff. At the time of trial, a Stipulation and Release was entered into between plaintiff

Dessauer and defendants. Pursuant to the terms of the Release, Dr. Malleis was also released from liability by Dessauer.

The facts concerning the incident which formed the basis for the lawsuit are straightforward. The deceased was admitted to the Hospital emergency room complaining of chest pains. The nurse on duty was Glorious Bourque, an obstetrical specialty nurse, who was transferred to emergency room duty. Dr. Malleis was called to the Hospital, made the tentative diagnosis that the patient was having an acute myocardial infarction, and ordered that fifty (50) milligrams of Lidocaine be administered to the patient. The nurse erroneously injected the wrong vial which resulted in decedent receiving eight hundred (800) milligrams of Lidocaine. The patient suffered a grand mal seizure and had a cardiac respiratory arrest; resuscitation was undertaken and a relatively normal heartbeat established. However, a subsequent diagnosis of irreversible brain damage was made, life support was discontinued, and the patient died.

The action was tried upon the Third Party Complaint. The trial court designated the Hospital and Glorious Bourque as plaintiffs and Dr. Malleis as defendant. The case was submitted upon six "Interrogatories to the Jury," unaccompanied by a general verdict. In accordance with the answers returned by the jury, judgment was entered for defendant and plaintiffs appeal. We should affirm.

Plaintiffs raise four points in this appeal, each of which will be discussed *seriatim.*

A. *The submission of interrogatories not accompanied by a general verdict was not erroneous.*

Plaintiffs claim that the trial court erred in submission of the case to the jury on interrogatories unaccompanied by a general verdict and in the court's statement of issues for decision.

1. *The forms of verdicts tendered by plaintiffs were erroneous.*

The trial court submitted six interrogatories to the jury but refused to submit the following three verdicts requested by plaintiffs:

(1) *VERDICT*

We find that the Plaintiffs and the Defendant are jointly guilty of negligence which was the proximate cause of the death of Wiley J. Dessauer and Plaintiffs are entitled to contribution from the Defendant in the amount of $112,500.00.

(2) *VERDICT*

We find that the Defendant was free from any negligence which was the proximate cause of the death of Wiley J. Dessauer and that the negligence of the Plaintiffs herein was the proximate cause of the death of Wiley J. Dessauer and Plaintiffs are not entitled to recover any sum.

(3) *VERDICT*

We find that the Defendant was negligent and was the primary wrongdoer and that such negligence was the proximate cause of Wiley J. Dessauer's death and the Plaintiffs are entitled to indemnification from the Defendant in the amount of $225,000.00.

"In drawing verdict forms care must be taken to ensure that they cover every possible finding the jury may make under the evidence from the point of view of each plaintiff and each defendant. Illinois Pattern Jury Instructions, p. 201. These forms of verdict do not." *Eggimann v. Wise,* 41 Ill.App.2d 471, 191 N.E.2d 425, 432 (1963); *McDrummond v. Montgomery Elevator Company,* 97 Idaho 679, 551 P.2d 966 (1976).

The first requested verdict form on contribution was erroneous. It was not a general verdict form required under UJI 18.9, entitled Uniform Contribution Among Joint Tort-Feasors Act. Under Directions For Use, "This form of verdict is to be used when Instruction UJI 14.30 is applicable." Plaintiffs did not request UJI 14.30 which pertains to "Uniform Contribution Among Joint Tort-Feasors Act Where Settlement Is Made With One Of The Several Defendants." This instruction could have been adapted for use in the instant case. The

first requested verdict form was also erroneous because it treated the Hospital and Glorious Bourque, the nurse, as one party entitled to a 50% recovery. The evidence raised issues of active negligence on the part of both the Hospital and the nurse. No provision was made in the requested verdict form for three tort-feasors—hospital, nurse, doctor.

The third requested verdict form on indemnity was erroneous. Based upon the evidence, the Hospital and Bourque were not entitled to indemnification.

To have submitted the second requested verdict form alone would have been reversible error. *Eggimann, supra; McDrummond, supra.* To have submitted the three requested verdict forms would have been reversible error.

The requested verdict forms were erroneous.

2. *Rule 49 of the Rules of Civil Procedure is not applicable.*

The trial court, *sua sponte*, submitted six interrogatories to the jury. No request was made by plaintiffs or defendant. In fact, they objected. Error is claimed for failure of the trial court to submit a general verdict along with the interrogatories, based primarily on Rule 49 of the Rules of Civil Procedure and *Saavedra v. City of Albuquerque*, 65 N.M. 379, 338 P.2d 110 (1959).

Rule 49 of the Rules of Civil Procedure reads:

> In civil cases, *the court shall at the request of either party*, in addition to the general verdict, *direct the jury to find upon particular questions of fact*, to be stated in writing by the party requesting the same. When the special finding of facts is inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly. [Emphasis added.]

We should look askant at this rule in effect since territorial days. It mandates the submission of questions of fact when requested, yet is judicially declared to be within the discretion of the trial court. The

word "shall" has been translated to mean "may" in the application of the rule. Rule 49 should be amended to read that "the court may at the request of either party ... direct the jury to find upon particular questions of fact." Otherwise "shall" and "may" will remain a thorn in the side of § 12–2–2(I), N.M.S.A.1978 wherein "shall" is declared to be mandatory and "may" permissive.

Rule 49 becomes applicable when either party requests the trial court "to direct the jury to find upon particular questions of fact." In the instant case, none of the parties made a request of the trial court. Rule 49 is not applicable. Plaintiffs mistakenly rely upon Rule 49.

Judge Wood agrees with plaintiffs that Rule 49 is applicable and states:

> Because of *Saavedra*, supra, we cannot uphold the jury's answers in this case as a special verdict. . . .

Judge Wood relied on *Smith v. Gizzi*, 564 P.2d 1009 (Okl.1977) to support the position that answers to interrogatories in the instant case were in effect a general verdict in compliance with *Saavedra* and Rule 49. To follow Judge Wood's attempt to escape *Saavedra*, is to force a reversal of this case, not an affirmance, because *Saavedra* specifically rejected Oklahoma law.

I join with Justice Clark who opened a dissent in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1946) as follows:

> The ipse dixit of the majority has no support in our case.

"Ipse dixit" statements of the law have caused confusion and explanation through the course of New Mexico judicial history. *State v. Alderette*, 86 N.M. 600, 608, 526 P.2d 194 (Ct.App.1974), Sutin, J., dissenting.

In *Saavedra*, the employer claimed that special interrogatories submitted to the jury amounted to a special verdict. The court said:

> [B]ut our Rule 49 is too limited to allow *such construction*. . . . [Emphasis added.] [65 N.M. 382, 338 P.2d 110.]

"Too limited to allow such construction" means that we cannot construe Rule 49 to include a special verdict because it is confined within limits to such a degree as to be regrettable. When a party relies upon Rule 49 in the district court, the party cannot change horses in an appeal and seek relief by way of special verdict. *Saavedra* did not say that "special verdict" is forbidden, prohibited, cannot be used, or does not allow the use of "special verdict," in the trial of a case. Neither did it deny a district court the right to seek a special verdict *sua sponte.* By judicial interpretation of Rule 49, it lacks common sense to say the Supreme Court intended so horrendous a result. To read into Rule 49 that "special verdicts are outlawed in New Mexico," which creates "a horse of a different color," is like calling a black horse a white horse or like calling an eagle a humming bird.

By omission of "special verdict" from Rule 49, the Supreme Court simply discouraged use of special interrogatories alone rather than special interrogatories accompanied by a general verdict. Rule 49 of the Federal Rules of Civil Procedure, which includes the "special verdict," was designed to encourage the use of the special verdict. *Keller v. Brooklyn Bus Corporation,* 128 F.2d 510 (2d Cir. 1942), Frank, J., dissenting.

3. *Any right to have general verdicts submitted was waived.*

Even though Rule 49 be applicable, plaintiffs waived their right to submission of a general verdict to the jury. In *Saavedra,* interrogatories were submitted to the jury unaccompanied by a general verdict. The claimant objected. The court said:

> Because of the long established practice of submitting these compensation cases to a jury on special interrogatories alone, we have ... reluctantly reached the conclusion that the only provision for submitting special interrogatories to a jury is when they are accompanied by a general verdict, *unless the latter is waived* or it is so submitted by consent. [Emphasis added.] [65 N.M. 382, 338 P.2d 110.]

The Hospital objected only to the court's refusal to submit the Hospital's requested verdicts in lieu of interrogatories. No request for proper general verdicts were made and denied. No objection having been made for failure of the court to submit proper general verdicts, plaintiffs waived any right to have proper general verdicts submitted to the jury along with questions of fact. Neither is it an issue that can be raised for the first time in this appeal.

Plaintiffs waived the giving of a general verdict. This waiver avoided the application of *Saavedra.*

4. *Saavedra has been interpreted to include a special verdict.*

In *Wright v. Atchison, Topeka and Santa Fe Railway Co.,* 64 N.M. 29, 37, 323 P.2d 286 (1958), the Supreme Court said:

> [I]t is within the sound discretion of the trial judge, based upon the facts and circumstances involved in the particular case, *to determine whether the matter shall be submitted to the jury on general verdicts of special interrogatories or both.* ... [Emphasis added.]

One year later, in 1959, *Saavedra* appeared. In arriving at its "reluctant" conclusion, *Saavedra* did not mention *Wright, supra.* However, *Saavedra* stands alone in New Mexico. Under Rule 49, it was followed in the appellate courts of Illinois, *Haywood v. Swift and Company,* 53 Ill.App.2d 179, 202 N.E.2d 880 (1964); *Sangster v. Van Heck,* 41 Ill.App.3d 5, 353 N.E.2d 192 (1976) until *Sangster,* on review, was reversed by the Supreme Court, *Sangster v. Van Heck,* 7 Ill.Dec. 92, 67 Ill.2d 96, 364 N.E.2d 79 (1977). One interrogatory was submitted to the jury on the contributory negligence of Billy Sangster. The jury answered "yes" but did not sign a general verdict. Based solely on the affirmative answer to the special interrogatory, judgment was entered for defendant. The Court of Appeals reversed. In reversing the Court of Appeals and affirming the trial court, the Supreme Court said:

> There is, in our judgment, no reasonable doubt as to the intent of the jurors in this case. They were clearly and ade-

quately instructed and informed in plain language that neither plaintiff could recover if they found Billy Sangster failed to exercise ordinary care in a manner proximately contributing to his injury. They so found. The addition of "yes" before each of their names lends emphasis to that finding. . . . In any event, we do not believe the failure to sign a general verdict form in this case casts any doubt upon the intent of the jurors. Since it is not contended their finding is unsupported by the evidence, we believe no useful purpose would be served by putting the defendant to the expense and inconvenience of a new trial. To hold otherwise, in our judgment, would truly exalt form over substance. [Id. 364 N.E.2d 82.]

To exalt substance over form, the same result is reached in the instant case. Following *Wright, supra*, the district court exercised its discretion in submitting special interrogatories *sua sponte*. They were answered absent a general verdict. *Sangster* converted Rule 49 into a "special verdict" rule. We can do the same.

*Saavedra* cites a case directly in point under a "special verdict" rule which case was not in point in *Saavedra*. *Cooper v. Evans*, 1 Utah 2d 68, 262 P.2d 278 (1953) involved an action by a business-invitee who suffered injuries received in a fall over a portion of the merchandise platform. "Upon trial, instead of submitting a general verdict, the trial court instructed the jury that it would only be required to find answers to certain questions of fact to which the court would then apply the law. . . . According to the answers given, the jury found the defendant guilty of negligence, but also found the plaintiff was contributorily [sic] negligent, upon the basis of which the trial court entered a judgment for the defendants." [Id. 279.] In affirming the ·judgment, the court said:

> In the instruction the court correctly defined negligence and contributory negligence and therein set out the standard of care required of Mrs. Cooper: that which an ordinary, reasonable, and pru-

dent person would use under the circumstances. The interrogatory was to be understood in the light of such instructions. Its effect therefore was to ask them whether she failed to meet the standard. Their affirmative answer precludes her recovery. Neither the fact that the jurors may have been disappointed with the result, nor that they may not have understood the full legal consequences of their findings, affect their validity. Under the procedure followed by the trial judge their function was but to make the finding of fact. [Id. 280–281.]

Being realistic, not technical, using common sense, not nonsense, Rule 49 and "special verdict" are identical because the general verdict is a useless appendage, to be later pointed out.

5. *The trial court did not err in the statement of issues to be decided.*

Plaintiffs' claim of error arises over the court's refusal to give its first requested instruction on the issues in which plaintiffs sought reimbursement by way of indemnity or alternatively for contribution. In other. words, the court's instructions left the jury in the dark as to the nature and elements of indemnity and contribution, the claims being tried. These omissions were not erroneous.

The crucial issues were those of negligence and proximate cause which was submitted to the jury by special interrogatories. If the answers were favorable to plaintiffs, the resolution of indemnity or contribution would have been a simple matter of accounting by the court. *Bailey v. Jeffries-Eaves, Inc.*, 76 N.M. 278, 414 P.2d 503 (1966).

Plaintiffs cite no authority to support the need for an instruction on contribution and indemnity.

To support their position, plaintiffs argue this way:

> [T]he jury might not appreciate that liability for the settlement could be shared between the nurse, hospital and doctor. The jury could well conclude that the doctor, if responsible at all, might be re-

sponsible for the entire settlement amount or reason that the hospital and nurse, if negligent, should not recover regardless of the doctor's conduct.... the jury was totally in the dark about the significance of answers to interrogatories. The extent to which this ignorance influenced the answers to interrogatories can never be known.

This argument is pure speculation. We cannot read the minds of the jury during deliberations. Additional unnecessary instructions are deemed to be harmful. Experience has proved that simplicity in instructions leads to a better knowledge of the law and its application to the facts. The omission of such instructions from UJI is the best teacher of that principle.

Ignorance of the law of contribution and indemnity did not influence the answers to interrogatories. Prejudice has not been shown.

The trial court properly presented a statement of the issues to be decided by the jury.

6. *The instant case is one in which the "special verdict" is applicable, not Rule 49.*

The trial court, *sua sponte*, submitted the following six interrogatories to the jury, five of which were answered so as to exonerate Dr. Malleis:

INTERROGATORY NO. 1: Was Dr. Ronald J. Malleis negligent? *Answer* —No.

INTERROGATORY NO. 2: (Omitted)

INTERROGATORY NO. 3: Was Glorious Bourque negligent? *Answer*—Yes.

INTERROGATORY NO. 4: If the answer to Interrogatory No. 3 is "yes", was the negligence a proximate cause of the death of Wiley J. Dessauer? *Answer* —Yes.

INTERROGATORY NO. 5: If the answers to Interrogatories Nos. 3 and 4 are "yes", was Memorial General Hospital negligent apart from the negligence of Glorious Bourque? *Answer*—Yes.

INTERROGATORY NO. 6: If the answer to Interrogatory No. 5 is "yes", was

the hospital's negligence a proximate cause of the death of Wiley J. Dessauer? *Answer*—Yes.

In summary, the jury found that Dr. Malleis was not negligent. It also found that the hospital and nurse were each negligent and the negligence of each proximately caused the death of decedent.

From the answers to these interrogatories, the trial court entered judgment for Dr. Malleis.

The question is: Did the answers to interrogatories constitute a "special verdict"? The answer is "Yes."

New Mexico has no statute, rule or decision which defines a "special verdict" or its method of use. This procedural rule must be judicially declared. In adopting Rule 49, the Supreme Court followed the statute enacted by the territorial legislature—Laws 1889, ch. 45, § 1. The "special verdict" was not included. The instant case appears to be the first that presents us with this verdict problem of ancient origin.

In the first instruction given all issues between the parties were set forth. Plaintiffs claimed that the proximate cause of the death of decedent was certain claims of negligence on the part of Dr. Malleis, the burden of proving such negligence being upon plaintiffs. Defendant denied plaintiffs' claims and asserted that plaintiffs were negligent and their negligence was the proximate cause of decedent's death, the burden of proving such negligence being on Dr. Malleis. General UJI instructions were given but the last instruction read as follows:

Upon retiring to the jury room and before commencing your deliberations you will select one of your members as foreman.

When as many as ten of you have agreed upon the answer to each interrogatory, your foreman must indicate the answer and sign the interrogatory.

When you have agreed upon the answer to all interrogatories requiring an answer, you will all then return to open court.

Plaintiffs did not object to the submission of interrogatories to the jury. They objected only to "the court's submission of interrogatories to the jury as being misleading." We should disagree. The interrogatories were clear in scope and covered all of the material facts and issues in this appeal.

The difference between a "general verdict" and "special verdict" was stated in *Walker v. New Mexico & S. P. R. Co.*, 165 U.S. 593, 17 S.Ct. 421, 41 L.Ed. 837 (1897) which case arose from the Territory of New Mexico. [7 N.M. 282, 34 P. 43.] In the Legislative Assembly of 1889, an Act in Relation to Trial by Jury was enacted (N.M. Laws 1889, ch. 45, p. 87) which today is Rule 49 of the Rules of Civil Procedure. In the course of its opinion the court said:

> Now a general verdict embodies both the law and the facts. The jury, taking the law as given by the court, apply that law to the facts as they find them to be and express their conclusions in the verdict. . . . it was not infrequent to ask from the jury a special rather than a general verdict, that is, instead of a verdict for or against the plaintiff or defendant embodying in a single declaration the whole conclusion of the trial, one which found specially upon the various facts in issue, leaving to the court the subsequent duty of determining upon such facts the relief which the law awarded to the respective parties. [165 U.S. 596, 17 S.Ct. 422, 41 L.Ed. 841.]

The definition of a "special verdict" was quoted concisely in *Roske v. Ilykanyics*, 232 Minn. 383, 45 N.W.2d 769, 775 (1951):

> "A special verdict is one by which a jury finds the facts only. It so presents the findings of fact as established by the evidence that nothing remains for the court to do but to draw therefrom conclusions of law."

*Cook v. State*, 506 S.W.2d 955, 959 (Tenn. Cr.App.1973) stated the definition of "special verdict" in this fashion:

> A special verdict is one in which the jury reports to the court specific findings upon controlling issues of fact, usually submitted to the jury in the form of factual questions for consideration and determination from the evidence. A special verdict thus returned must on its face embrace a finding of all the facts that may be required to warrant a judgment. . . .

The above are the common definitions of a "special verdict," 39A Words and Phrases, *Special Verdict*, p. 389 (1953).

The distinction between a special verdict and special interrogatories with a general verdict was stated in *Childress v. Lake Erie & W. R. Co.*, 182 Ind. 251, 105 N.E. 467 (1914). It makes this distinction:

> There is, however—
>
> > "a manifest difference between a special verdict and a finding of the facts in answer to interrogatories propounded to the jury. A special verdict is in lieu of a general verdict, and its design is to exhibit all the legitimate facts and leave the legal conclusions entirely to the court. Findings of fact in answer to interrogatories do not dispense with the general verdict. A special verdict covers all the issues in the case, while an answer to a special interrogatory may respond to but a single inquiry pertaining merely to one issue essential to the general verdict." Words and Phrases, vol. 7, p. 6596; *Morbey v. Chicago, etc., R. Co.*, 116 Iowa 84–89, 89 N.W. 105, 107.
>
> If a jury finds on special questions of fact in answer to interrogatories, without a general verdict, the finding is of no force and the court cannot give to the special finding any weight unless they are sufficiently numerous and explicit to leave nothing for the court to do but to determine questions of law. If they affirmatively show the existence of every fact necessary to entitle plaintiff to a recovery and the nonexistence of every defense presented under the issues, or if they show as a matter of law that a valid defense has been established by the evidence, they may then constitute a special verdict.

In the instant case, the trial court submitted the case to the jury to obtain a "special verdict."

A "special verdict" is one used in lieu of a "general verdict." *Walker* held that a "special verdict" rather than a general verdict is appropriate, one that leaves "to the trial court the duty of determining upon such facts the relief which the law awarded the respective parties."

Frank, Courts on Trial, pp. 141–142 (1949) says:

> ... a "special verdict" (or "fact verdict") [is one in which]: the trial judge tells the jury to report its beliefs, its findings, about specified issues of fact raised at the trial. ... To those facts, thus "found" by the jury, the trial judge applies the appropriate legal rule.... The special verdict is nothing new. It was used in England centuries ago, and was early imported into this country.... A streamlined form of special verdict and of special interrogatories was authorized in the federal courts in 1938. In those courts, as in the courts of some states, it is optional with the trial judge in each civil jury case to employ either or neither of these methods, and the judges seldom use either of them. I think that one or the other should be compulsory in most civil suits.

Sunderland, *Verdicts, General and Special*, XXIX Yale L.J. 253, 262 (1920) says:

> The real objection to the special verdict is that it is an honest portrayal of the truth, and the truth is too awkward a thing to fit the technical demands of the record.... [the general verdict] covers up all the shortcomings which frail human nature is unable to eliminate from the trial of a case.... In short, the general verdict is valued for what it does, not for what it is. It serves as the great procedural opiate, which draws the curtain upon human errors and soothes us with the assurance that we have attained the unattainable.

For an excellent discussion of special verdicts, see *Sahr v. Bierd*, 354 Mich. 353, 92 N.W.2d 467 (1958); *Skidmore v. Baltimore & O. R. Co.*, 167 F.2d 54 (2nd Cir. 1948);

Lipscomb, *Special Verdicts Under The Federal Rules*, 25 Wash.U.L.Q. 185 (1940); *Nylander v. Rogers*, 41 N.J. 236, 196 A.2d 1 (1963); *Sudia v. Hill Corp.*, 6 Ohio St.2d 160, 216 N.E.2d 882 (1966); Finz, *Does the Trend in Our Substantive Law Dictate an Expended Use of the Special Verdict?*, 37 Albany L.Rev. 229 (1973).

In essence, when rendered by way of a special verdict, the answers to interrogatories on essential issues pierce the conscience of the jury during deliberations. The answers make public that which is hidden. When rendered by way of a general verdict, the deliberations of the jury cannot be questioned. The truth revealed in "special" findings of fact, less in scope than a special verdict, overrides an inconsistent general verdict. *Bryant v. H. B. Lynn Drilling Corporation*, 65 N.M. 177, 334 P.2d 707 (1959); *Upton v. Santa Rita Mining Co.*, 14 N.M. 96, 89 P. 275 (1907). In other words, a general verdict is a useless appendage where the truth is sought from the jury by way of answers to interrogatories. For this reason, rarely do either of the parties request a special verdict.

It is unquestionable that the answers to interrogatories were supported by substantial evidence and stand in the posture as that of unchallenged findings of fact. *Lovato v. Hicks*, 74 N.M. 733, 398 P.2d 59 (1965). Absent any reversible error on other grounds, defendant was entitled to judgment as a matter of law.

The submission of interrogatories in the instant case, unaccompanied by a general verdict, was not erroneous. The matter was properly submitted to the jury as for a special verdict.

B. *The trial court properly instructed jury on borrowed servant doctrine.*

Plaintiffs tendered proposed Uniform Jury Instructions on malpractice based upon those in preparation by the Supreme Court's Advisory Committee on Uniform Jury Instructions. As now approved by the Supreme Court, they read:

UJI 11.14, entitled *Liability of Operating Surgeon—Agency (Captain of Ship Doctrine)*:

> [*A doctor*] [An operating surgeon] who has the right to control and supervise the activity of assistants, nurses and others, is responsible for negligent acts or omissions of any such person during [an operation] [*specific treatment*] under the immediate and direct control and supervision of the doctor. [Emphasis added.]

UJI 11.24, entitled *Hospital Liability— Loan Servant Exception*:

> A hospital is not responsible for acts or omissions of its employees where [a doctor] [an operating surgeon] has *assumed the exclusive right to control and supervise the activity of* _____ [hospital nurses, assistants, attendants, etc.] during the course of an operation [during specific treatment under the immediate and direct control and supervision of the doctor]. [Emphasis added.]

UJI 11.14 is not a "Captain of Ship Doctrine" instruction insofar as it includes "specific treatment" by a surgeon. This doctrine first arose in *McConnell v. Williams*, 361 Pa. 355, 65 A.2d 243, 246 (1949), two justices dissenting. In the course of the majority opinion, the court said:

> And indeed it can readily be understood that in the course of an operation in the operating room of a hospital, and until the surgeon leaves that room at the conclusion of the operation ... he is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board .... [Emphasis added.]

It is obvious that this doctrine is not applicable to a doctor treating a patient in the hospital.

Plaintiffs abandoned the "Captain of the Ship" doctrine. They claim Dr. Malleis was liable under the "Borrowed Servant" doctrine. The essential elements are set forth in *Ballard v. Leonard Brothers Transport Co., Inc.*, 506 S.W.2d 346, 350 (Mo.1974):

> ... Essentially, they are: "(a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special master pursuant to an express or implied contract so to do; and (c) *power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.*" [citations omitted.] ... [Emphasis added.]

This rule applies in medical malpractice cases in which a hospital nurse is "borrowed" by a doctor. *Elizondo v. Tavarez*, 596 S.W.2d 667 (Tex.Civ.App.1980). The court said:

> ... Under the borrowed servant doctrine in a suit for malpractice against a doctor, *the controlling question is whether the doctor had the right to control the "servant" in the details of the specific act or omission raising the issue of liability.* [Citation omitted.] ... [Emphasis added.] [Id. 671.]

UJI 11.14, stripped of excessive verbiage, and as tendered by plaintiffs, reads:

> A doctor who has the right to control and supervise the activity of assistants, nurses and others, is responsible for negligent acts or omissions of any such person during specific treatment under the immediate and direct control and supervision of the doctor.

Plaintiffs claim the trial court erred in refusing to instruct the jury on a doctor's right *and duty* to supervise the conduct of a nurse under his control.

The court instructed the jury as to the doctor's control and supervision of the nurse as follows:

> \*   \*   \*   \*   \*   \*
>
> 2. *The Defendant [Dr. Malleis] had the right and duty to control and supervise the activity of Plaintiff, Glorious Bourque*, during the entire treatment of Wiley J. Dessauer, deceased, from the time Dr. Malleis arrived to commence his treatment at the emergency room until the patient was transferred to the intensive care unit of Memorial General Hospital *and that he was negligent in such control and supervision.*

3. That the Plaintiff Glorious Bourque, advised the Defendant, Ronald J. Malleis, that there was a problem in administering the medication to the patient and that *the Defendant, Ronald J. Malleis, failed to use the care as a specialist in internal medicine in thereafter assuming direct control, treatment and caring for the patient.* [Emphasis added.]

To summarize these instructions, Dr. Malleis had the right *and duty* to control and supervise the activity of Glorious Bourque, a nurse; that he was negligent in such control and supervision; that after Bourque advised him of the problem, Dr. Malleis failed to use the care as a specialist after "assuming direct control, treatment and caring for the patient."

There is no realistic difference between these instructions and UJI 11.14 tendered by plaintiffs. In fact, the "control" instruction given was more harmful to Dr. Malleis than UJI 11.14. The latter reads "a doctor who has the right to control." This is an issue of fact. The instruction given reads "The doctor had the right *and duty* to control and supervise." This is a statement of law. The duty to control and supervise the nurse was imposed on Dr. Malleis. This was more than compliance with the "Borrowed Servant" doctrine.

Plaintiffs say they "tendered these instructions on the theory of Dr. Malleis' vicarious liability and Dr. Malleis' own negligence in failing to discover and prevent the medication overdose."

"Vicarious liability" is defined in *Nadeau v. Melin*, 260 Minn. 369, 110 N.W.2d 29, 34 (1961) as follows:

Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another.

"In this sense the policy behind vicarious statutory liability is identical to the policy which holds a master vicariously liable, without personal participation, for the torts of his servants." *LaBonte v. Federal Mutual Insurance Company*, 159 Conn. 252, 268 A.2d 663, 666 (1970). Where, however, the master, or one who has the right to control another, is present, failure to exercise a control which he has, when it should have been exercised, may well constitute negligence of the one in control, as well as other affirmative acts or failure to act when reasonable prudence would require it. *Nadeau, supra; Siburg v. Johnson*, 249 Or. 556, 439 P.2d 865 (1968).

Plaintiffs tendered these instructions on the theory that Dr. Malleis, who had the right and duty to control Bourque, the nurse, was liable for her negligent acts. UJI 11.24 was tendered and refused, properly so, for two reasons.

(1) As heretofore shown, UJI 11.24 was given by the court. No error could arise by the court's refusal to give it.

(2) Plaintiffs were not entitled to this instruction under the "Borrowed Servant" doctrine. It does not apply to the hospital-nurse-doctor relationship wherein a nurse, in the performance of the regular course of services furnished by the hospital, negligently administers treatment to a patient in a specific act that the doctor orders to be performed. The rule comes into play when the doctor orders "the details of the specific act or omission." In *Elizondo, supra*, a nurse on the order of a surgeon, inserted a Levin Tube to relieve the plaintiff. The court said:

Where an attempt is made to apply the borrowed servant doctrine to the field of medicine in a non-operating room situation, such as is the case here, absent any special circumstances, *vicarious liability cannot be imposed upon the attending doctor for negligence in the treatment prescribed by him, but administered by a floor nurse employed by the hospital in the regular course of the services furnished by the hospital....* [Emphasis added.] [Id. 671–2.]

This rule was also applied where a nurse administered an injection of morphine and vistaril in the left buttock of a patient upon the order of the doctor. *Su v. Perkins*, 133 Ga.App. 474, 211 S.E.2d 421 (1974). Summary Judgment for the doctor was affirmed. The court quoted the following from a previous case:

"Accordingly, following the lead of the Minnesota Supreme Court, 'we adopt the rule that a hospital is liable for the negligence of its nurses in performing mere administrative or clerical acts, which acts, though constituting a part of a patient's prescribed medical treatment, do not require the application of the specialized technique or the understanding of a skilled physician or surgeon....'" [Id. 425.]

*Beaches Hospital v. Lee*, 384 So.2d 234, 237 (Fla.App.1980), in which a hospital sought contribution from a physician, the court held that "when the nurse's services are simply ministerial in character [mistake in sponge count], she is not regarded as the doctor's borrowed servant, but rather as the servant of the hospital, so that the latter may be vicariously liable to the patient."

In the instant case, Dr. Malleis did not exercise any right or duty to supervise and control Glorious Bourque. He did not engage her service, supervise the method and manner in which the medication should be administered, nor supervise the type of vial and syringe to use. The evidence showed that Bourque was seeking assistance from Dr. Malleis, and Dr. Malleis did not give any orders.

The philosophical basis of this rule was stated in *Foster v. Englewood Hospital Association*, 19 Ill.App.3d 1055, 313 N.E.2d 255, 259 (1974):

We are not persuaded of the fairness of a rule which would permit the invocation of the doctrine of respondeat superior for every act of negligence by an employee of the hospital simply because the employee came under the temporary supervision or control of the operating surgeon. As a practical matter, the personnel of the hospital and their abilities are often

unknown to the surgeon. He may request the assignment of a particular person but usually has little voice in the selection of those who will assist him. The surgeon's own acts, which most directly affect the life and well being of a patient, charge him with his own awesome responsibility. He should not also be saddled with the role of guarantor of the patient's safety from the negligence of others.

A judicial approach to the awesome responsibility of a doctor must recognize that the primary duty of a doctor in an emergency is to focus upon the serious medical problem from which a patient suffers. In such emergency, the primary duty of the hospital is to focus upon the competence of nurses to perform their duties. The doctor's and hospital's duties are independent primary duties, each of which should serve to seek the best possible recovery of the patient. To rule otherwise would divert the doctor from his primary duty. The duty of the hospital should not be shifted to a doctor by way of the "Borrowed Servant" doctrine unless the doctor selects the hospital nurse as an assistant due to his knowledge of her competence and exercises control and supervision over the details of her work, or, unless the doctor orders an assigned nurse to perform duties which the doctor knows are beyond her competence and the duties for which she was employed, thus exercising control and supervision. A doctor has the right to rely upon a hospital to furnish a nurse who is qualified, competent and trustworthy in the performance of her duties. Glorious Bourque, admittedly, was not.

UJI 11.24, stripped of excessive verbiage and as tendered by plaintiffs, reads:

A hospital is not responsible for acts or omissions of its employees *where a doctor has assumed the exclusive right to control and supervise the activity of the nurse* during specific treatment under the immediate and direct control and supervision of the doctor.

*Foster, supra*, held that the hospital employee must become wholly subject to the

control and direction of the doctor, and free from the control of the hospital during the temporary period. It said:

> ... In order to create the [borrowed servant] relation, therefore, the original employer must resign full control of the employee for the time being, it not being sufficient that the employee is partially under the control of a third person. (I.L.P. Employment § 2, page 368.) It would thus appear under this doctrine that both the doctor and the hospital could not be liable for the same negligent act of the hospital's "employee." [Id. 313 N.E.2d 259.]

*Piehl v. Dalles General Hospital*, 280 Or. 613, 571 P.2d 149 (1977) involved cross-claims filed by a surgeon and the hospital against each other. This was an operating room case in which the nurses were assigned to keep track of sponges which were used in the operation. The trial court directed a verdict erroneously by requiring the hospital to indemnify the doctor. In the course of its opinion, the court stated:

> ... There is no doubt that the nurses were regular employees of the hospital and that they were negligent. The hospital contends, however, that at the time the sponges were counted the nurses were the loaned servants of the surgeon, who had the right to control their activities, and not the servants of the hospital; therefore, the surgeon had responsibility for their negligence.
>
> *The hospital can act only through its employees. It furnished services to plaintiff through the work of the nurses for which it was being paid by plaintiff. It owed a duty to plaintiff not to perform these services negligently.* That duty was breached when the nurses miscounted the sponges. There was no disproportion in the character of the duty owed to plaintiff by each defendant. The gravity of the fault of the nurses was as great as any fault that could have been committed by the surgeon.... *Regardless of whether or not the nurses were the loaned servants of the surgeon for some purposes, they remained servants of the hospital in carrying out the work for which it was being paid by plaintiff.* [Emphasis added.] [Id. 152.]

Dr. Malleis did not "assume the exclusive right to control and supervise the activity of Glorious Bourque during specific treatment" as required under UJI 11.24. To have given this instruction would have been reversible error. Circumstances may arise under which a doctor might "assume the exclusive right to control and supervise the activity of" a nurse. No such event has yet been found in doctor-hospital-nurse relationships.

The trial court properly instructed the jury on the "Borrowed Servant" doctrine.

D. *Giving second paragraph of UJI 8.1 on Duty of Doctor was not erroneous.*

Plaintiffs claim the second paragraph of UJI 8.1 on "Duty of Doctor" given to the jury was erroneous. It reads:

> The *only* way in which you may decide whether the defendant possessed and applied the knowledge and used the skill and care which the law required of him is from evidence presented in this trial by physicians testifying as exepert witnesses. In *deciding this question you must not use any personal knowledge of any of the jurors.* [Emphasis added.]

Under "Directions for Use," it is stated:

> The second paragraph of this instruction will be used in most cases *but occasionally the breach of duty complained of may be a matter of common knowledge and in such cases the second paragraph must be omitted.* [Emphasis added.]

Plaintiffs claim that expert testimony was not required to establish the violation of a standard of care of knowledge by Dr. Malleis. On the vial selected by nurse Bourque was a warning which read: "FOR DILUTION ONLY. NOT FOR DIRECT INJECTION." Dr. Malleis failed to read this warning and the description of the medication which appeared on the vial and syringe used by Bourque. Dr. Malleis handled this vial and syringe himself two and perhaps three times immediately before the contents were injected into decedent.

There was expert testimony that failure to read the label did not fall below the standard of care. There was no lay testimony. Plaintiffs say that the jurors were in as good a position as the physicians to arrive at a final conclusion because it was a non-medical judgment.

The second paragraph of UJI 8.1 is a "common knowledge" exception to the rule requiring expert medical testimony in malpractice cases.

*Webb v. Lungstrum*, 223 Kan. 487, 575 P.2d 22, 25 (1978) says:

... This common knowledge exception applies if what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally.

Without reference to "Direction for Use," *Pharmaseal Laboratories, Inc. v. Goffe*, 90 N.M. 753, 758, 568 P.2d 589 (1977) says:

[I]f negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential. [citations omitted.] *Such evidence includes lay testimony regarding non-technical mechanical acts by the physician, as we have here.* [Emphasis added.]

"Non-expert witnesses can testify as to external appearances and manifest conditions observable by anyone." *Hiatt v. Groce*, 215 Kan. 14, 523 P.2d 320, 325 (1974).

Plaintiffs may have misconstrued the meaning of the second paragraph of UJI 8.1 and its relation to the "common knowledge" concept. The jury must listen only to the testimony of physicians in determining whether a doctor violated the standards of skill and care. It must not rely on its own personal knowledge. In the event the standard calls for a non-medical judgment, the jury can take into consideration *the testimony of lay people* with reference to the standard. In *Webb, supra,* the court said:

... When, in a given case, the diagnosis, treatment or care of a patient brings such bad results that lack of reasonable care would be apparent, using the common everyday knowledge of persons generally, such facts may be testified to by persons other than physicians.... [575 P.2d 25.]

There was no such testimony by persons other than physicians.

Plaintiffs' argument leads in the wrong direction. They state:

The very simple question for the jury, a question which juries are quite capable of determining, is whether, *under all the circumstances,* Dr. Malleis had sufficient information to cause him to read the warning on the instrument in his hand?

. . .

\*　　\*　　\*　　\*　　\*　　\*

The jurors were in as good a position as the physicians to arrive at the final conclusion....

\*　　\*　　\*　　\*　　\*　　\*

It is the position of plaintiffs ... that the jurors should not have been required to evaluate the reasonable prudence of Dr. Malleis' conduct solely "... from evidence presented in this trial by physicians testifying as expert witnesses." UJI 8.1. Rigidly applying this rule, the jurors may have concluded that Dr. Malleis should prevail for the sole reason that two experts testified on his behalf and only one on behalf of plaintiffs.

This argument is far removed from the second paragraph of UJI 8.1 and "Directions for Use."

What the "common knowledge" concept means can be illustrated:

*Pharmaseal* involved the care exercised by a surgeon in the withdrawal of an intestinal tube which had been inserted through the nose down through the stomach. Expert testimony was unnecessary because any person watching the withdrawal could testify as to whether the surgeon pulled out the tube fast, jerked it several times and forcefully pulled on the tube as though it had been stuck, thereby extracting it.

*Mascarenas v. Gonzales*, 83 N.M. 749, 497 P.2d 751 (Ct.App.1972) involved a chiropractor who pressed down on plaintiff's body and fractured the patient's ribs. Expert testimony was unnecessary because any person observing the performance could testify as to the method and force used.

*Webb* involved the failure of an orthopedic surgeon to take x-rays. The court said:

... We feel there should be expert medical testimony to establish the standard of care in this and similar cases. [595 P.2d 26.]

The difference between the application of the "common knowledge" concept and the "physician-only" concept in the above cases appears to be observation by a person of non-technical aspects of a doctor's work as stated in *Hiatt*, and the alleged failure of a doctor to perform a duty required in the practice of medicine. Following this theory, there should be expert medical testimony to establish the standard of care required in the reading of a description of the medication which appeared on the vial and syringe selected by a nurse and shown to the doctor.

For a review of cases which held that expert testimony is necessary and the exceptions and limitations, see Annot. *Necessity of expert evidence to support an action for malpractice against a physician or surgeon*, 81 A.L.R.2d 597 (1962) and Later Case Service supplementing this annotation.

The trial court did not err in giving the second paragraph of UJI 8.1 on Duty of Doctor.